[Cite as *State v. Reeder*, 2016-Ohio-212.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | **No. 15AP-203** |
| Joseph Q. Reeder, | : | (C.P.C. No. 13JU-1723) |
| An Alleged Delinquent Child, | | |
| | : | **(REGULAR CALENDAR)** |
| [Appellant]. | | |
| | : | |
| State of Ohio, | | |
| | : | |
| Plaintiff-Appellee, | | **No. 15AP-218** |
| | : | (C.P.C. No. 14CR-394) |
| v. | | |
| | : | **(REGULAR CALENDAR)** |
| Joseph Q. Reeder, | | |
| | : | |
| Defendant-Appellant. | | |
| | : | |

D E C I S I O N

Rendered on January 21, 2016

*Yeura R. Venters*, Public Defender, and *David L. Strait*, for appellant.

*Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee.

APPEAL from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Joseph Q. Reeder, appeals from judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch ("juvenile court") and the General Division binding him over from the juvenile division to the general division and sentencing him to a 17-year term of imprisonment

following an *Alford* plea[1] to aggravated robbery, involuntary manslaughter with a firearm specification, and tampering with evidence. Specifically, Reeder challenges the bindover decision on grounds that it was an abuse of discretion on the facts of his case and that the juvenile court's stated reasons for the bindover were insufficient. Based on the following, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}   On February 4, 2013, Reeder shot and killed Anthony Hines in Reeder's home on the east side of Columbus, Ohio. Following investigation, a detective of the Columbus Division of Police filed a complaint against Reeder on February 5, 2013, alleging that Reeder had committed the crimes of murder, aggravated robbery, and tampering with evidence. In a hearing held the same day, the juvenile court determined there was probable cause to proceed and ordered Reeder held in custody.

{¶ 3}   A psychiatric evaluation of Reeder followed, along with stipulations by counsel as to service, Reeder's age at the time of the offenses (14 years old), and the fact that probable cause existed as to each count. On October 10, 2013, the juvenile court found probable cause for bindover and set a hearing on the matter. The hearing commenced January 13, 2014 and took place for four days.

{¶ 4}   The investigating detective, Ronda Siniff, testified first. She stated that, around 6 p.m. on February 4, 2013, she was notified of the incident between Reeder and Hines. Soon thereafter, Reeder and his grandparents flagged down a police car, and Reeder surrendered himself into police custody. Siniff then interviewed Reeder in a videotaped interview. According to Reeder (as relayed by Siniff and as observable in the videotape) he was at home alone with his younger brother when Hines came to the house seeking to purchase marijuana. Reeder's mother's boyfriend sold drugs out of the home, but he was not there to make the sale to Hines. Reeder told Hines to leave and Hines telephoned and spoke to Reeder's mother's boyfriend who also told Hines to leave. However, Hines did not leave. Instead he sat down on the couch. When Reeder again refused to sell Hines marijuana Hines punched him in the face. Reeder fled upstairs and retrieved a handgun. Downstairs again, Reeder attempted to shoot Hines who, according to Reeder, was still irate. The gun did not fire because the safety was on. Seeing that

---

[1] *North Carolina v. Alford*, 400 U.S. 25 (1970).

Reeder had tried to shoot him, Hines became angrier and chased Reeder downstairs into the basement. Reeder turned around as Hines reached the bottom of the stairs and, having disengaged the safety, shot Hines in the face.

{¶ 5} According to Siniff and the videotape, Reeder admitted that after shooting Hines, Reeder went through Hines' wallet and threw its contents in the air as he left the house. He also took Hines' car using Hines' keys. Reeder denied having gone through Hines' pockets, however Hines' pockets were pulled out, and the investigation later turned up Reeder's DNA inside Hines' pockets. Reeder threw the gun out the window as he drove Hines' car and, after attempting to give Hines' car to some "crack heads," he abandoned it and walked to his grandparents' house. (Jan. 13, 2014 Tr. 47.)

{¶ 6} Siniff also testified about an interview she conducted with Reeder's grandmother, and a recording of the interview was introduced. In the interview Reeder's grandmother told Siniff that Reeder called stating he had shot someone. He came to her house at her request and told her what had happened. According to Reeder's grandmother, Reeder said someone (whom Reeder did not identify but whom we now know to be Hines) came to his house looking to buy drugs and refused to leave, and, instead, sat on the couch. So Reeder eventually said, "Okay, I gotcha (sic), come on." (Jan. 14, 2014 Tr. 105.) He walked downstairs and Hines followed him. Once Reeder turned the corner downstairs he shot Hines. The audio recording of the interview confirms Siniff's account of the interview with Reeder's grandmother. The recording also contains other details. According to Reeder's grandmother, Reeder initially told his grandmother that he had burned Hines' car, but later told her where it was. Reeder did not mention having done anything with Hines' wallet. In addition, Reeder's grandmother made clear that Reeder did not change clothes while at her house.

{¶ 7} When Reeder's clothing was tested, none of Hines' blood was found on it. But the investigation did find some of Reeder's own blood on his clothing which, Siniff admitted, may have come from being hit in the face. In addition, Reeder consistently rubbed his jaw during the video interview including at times when he was alone in the room.[2]

---

[2] Reeder also talked to himself and seemed embarrassed when the detective entered the room while he was talking to himself.

{¶ 8}   Photographs of the scene that were introduced as exhibits during the hearing show that the basement was a single room with an open flight of wooden stairs dividing the room in the center.  From the vantage point of descending the stairs, Reeder's bed was directly to the left of the terminus of the stairs with only a few feet between the end of the stairs and the foot of the bed.  According to a crime scene investigator from the Bureau of Criminal Identification and Investigation of the Ohio Attorney General's office who testified on the second day of the hearing, Hines was found with his feet facing the bed and his head extended toward the stairs.  There was, however, some evidence that the body had been disturbed either by the shooter or by medical personnel.  Hines' body showed gunpowder stippling on his face indicating that he was shot at short range.  The bullet passed through his face and out the back of his head and was recovered near the head of the bed.  Considerable blood was present on the bed and stairs, and numerous small white porous fragments believed to be bone were found on and near the bed.  Other than that, Hines was determined to be near the bed and not on the stairs when he was shot; the crime scene expert was unable to testify as to Hines' and Reeder's relative positioning or whether and how each was moving at the time Hines was shot.

{¶ 9}   A grandnephew of Hines also testified.  He confirmed that Hines smoked marijuana.  He testified that Hines had difficulty remembering relatives' names and lived in a senior home.  He also testified that, despite Hines' relatively young age (64), Hines had considerable health problems, and he described Hines as "frail."  (Jan. 15, 2014 Tr. 20.)   Although the autopsy report listed Hines as 5'9" and 252 pounds, this witness testified that he believed the weight was an error and estimated Hines' weight at more like 120, 130, or at most 175 pounds.

{¶ 10} Relevant to the question of Reeder's bindover to adult felony court in the general division, an expert, Dr. Speicher-Bocija, who had evaluated Reeder, testified and concluded that the safety of the community would not be endangered if Reeder were kept confined by the Ohio Department of Youth Services rather than transferred to adult court. Although Dr. Speicher-Bocija admitted that in drafting her report she had not considered certain juvenile criminal court incidents in Reeder's past nor a previous evaluation, even being confronted with that additional information at the hearing did not change her ultimate conclusion.  She testified that in her professional opinion Reeder was amenable

to rehabilitation in a secure juvenile facility. She estimated an over 50 to 55 percent chance that Reeder could be rehabilitated by age 21 but acknowledged that there can never be certitude about such questions.

{¶ 11} Following oral argument on January 16, 2014, the final day of the hearing, the juvenile court orally analyzed several of the factors involved in a bindover determination and announced that it had decided to relinquish jurisdiction over Reeder's case and bind him over for proceedings in the general division. The next day the juvenile court memorialized its oral decision in an entry relinquishing jurisdiction for bindover. On February 4, 2014, the juvenile court released a more detailed decision setting forth the facts and factors considered in reaching the decision to bind Reeder over for trial in the general division.

{¶ 12} Following the bindover order, a grand jury indicted Reeder on February 10, 2014, for aggravated robbery with a gun specification, aggravated murder with a gun specification, and tampering with evidence. Reeder entered a not guilty plea on February 12, 2014. Approximately one year later, in a hearing held on February 2, 2015, Reeder entered an *Alford* plea to aggravated robbery without a gun specification, involuntary manslaughter with a gun specification, and tampering with evidence. After obtaining a presentence investigation and opposing sentencing memoranda from the defense and the state, the trial court reconvened on March 5, 2015, for a sentencing hearing at which it ordered Reeder to serve a total of 17 years at the Ohio Department of Rehabilitation and Correction. Specifically, the trial court sentenced Reeder to serve 4 years for aggravated robbery, 10 years for manslaughter with an additional 3 years for the gun specification, and 18 months on the tampering count. The trial court ordered Reeder to serve all counts and the specification consecutively to one another, except for the tampering, which Reeder was permitted to serve concurrently with the other counts and specification. Reeder now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 13} Reeder presents two assignments of error for review:

> [I.] The Juvenile Court erred by finding that Appellant was not amenable to rehabilitation in the juvenile court system without articulating its reasoning in a manner sufficient to permit meaningful appellate review.

[II.] The decision of the Juvenile Court granting the State's motion for discretionary bindover was erroneous.

Because much of the analysis of these assignments of error is related, we discuss them together.

## III. DISCUSSION

{¶ 14} As relevant in this case, R.C. 2152.12 describes the criteria for deciding to bindover a child for trial in a general division adult criminal felony court:

> (B) [A]fter a complaint has been filed alleging that a child is a delinquent child for committing an act that would be a felony if committed by an adult, the juvenile court at a hearing may transfer the case if the court finds all of the following:
>
> (1) The child was fourteen years of age or older at the time of the act charged.
>
> (2) There is probable cause to believe that the child committed the act charged.
>
> (3) The child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions. In making its decision under this division, the court shall consider whether the applicable factors under division (D) of this section indicating that the case should be transferred outweigh the applicable factors under division (E) of this section indicating that the case should not be transferred. The record shall indicate the specific factors that were applicable and that the court weighed.

In this case, Reeder stipulated that he was 14 years old or older and that there was probable cause to believe he had committed the offenses charged. Related to considering Reeder's amenability to rehabilitation within the juvenile system, the juvenile court considered at the hearing whether the factors set forth in division (D) of R.C. 2152.12 outweighed those set forth in division (E). If they do, juvenile bindover to adult felony court is warranted.

{¶ 15} The division (D) factors are:

> (1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.
(9) There is not sufficient time to rehabilitate the child within the juvenile system.

{¶ 16} The division (E) factors, which must be outweighed by the division (D) factors to justify transfer are:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or is a mentally retarded person.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

{¶ 17} We review for abuse of discretion the merits of the decision by the juvenile court to relinquish jurisdiction in favor of the general division, and in doing so, we note that no court has discretion to commit errors of law. *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, ¶ 39; *State v. Tauch*, 10th Dist. No. 13AP-327, 2013-Ohio-5796, ¶ 17; *State v. Akbari*, 10th Dist. No. 13AP-319, 2013-Ohio-5709, ¶ 7. Further, "[t]he record shall indicate the specific factors that were applicable and that the court weighed." R.C. 2152.12(B)(3). *See also Kent v. United States*, 383 U.S. 541, 560-61 (1966); *State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, ¶ 39.

{¶ 18} In a case cited by Reeder, *State v. D.H.*, 2d Dist. No. 26383, 2015-Ohio-3259, ¶ 17, the Second District implied that a court considering relinquishing jurisdiction should have performed a detailed analysis of the programs available to rehabilitate the child in the juvenile system before concluding that the child could not be rehabilitated in the juvenile system. While we agree that a court needs to genuinely consider the factors, and the record needs to reflect that fact consistent with R.C. 2152.12(B)(3), we have never gone as far as the Second District in directing the juvenile court's analysis.

{¶ 19} For instance in *State v. Erwin*, 10th Dist. No. 09AP-918, 2012-Ohio-776, ¶ 6, we considered whether the "juvenile court's bindover decision was contrary to law [when] the court failed to consider specific factors set forth in the Ohio Revised Code and based its decision only upon the seriousness of the charge." We concluded that "the hearing transcript indicates that the juvenile court expressly considered and weighed both the factors in favor of transferring [Erwin] to the adult system and those against transfer." *Id.* at ¶ 11. Specifically, the record showed that the juvenile court had considered the fact

that the victim died (R.C. 2152.12(D)(1)), that a firearm was allegedly used (R.C. 2152.12(D)(5)), that the defendant was mature enough to transfer (R.C. 2152.12(D)(8)), and that the crime was very serious (which is not a statutory factor but which the Supreme Court of Ohio has held that a court may consider in making a bindover decision).  *Id.*, citing *State v. Watson*, 47 Ohio St.3d 93 (1989), syllabus.  In that case, the record also indicated in *Erwin* that the juvenile court had considered that the victim did not induce or provoke the attack (R.C. 2152.12(E)(1) and (2)), that the defendant was the principal actor and caused physical harm (R.C. 2152.12(E)(3) and (4)), that he was on probation for a previous felonious assault (R.C. 2152.12(E)(5)), that he was mature enough for transfer (R.C. 2152.12(E)(6)), and that, although he was of "borderline" intelligence, there was no conclusive finding that he was mentally retarded[3] (R.C. 2152.12(E)(7)).  *Id.* at ¶ 12.  While the juvenile court in *Erwin* had not made detailed written findings or orally set forth analysis to the level of detail urged by the Second District in *D.H.*, we nonetheless found the juvenile court's analysis sufficient.  *Id.* at ¶ 15.

{¶ 20}  Here too, the record is sufficient to meet the statutory requirement, and the resulting decision does not constitute an abuse of discretion.  The juvenile court in this case under review analyzed the statutory factors both orally and in writing.  On January 16, 2014, which was the final day of the four-day amenability hearing, the juvenile court announced its decision orally and stated:

> [H]e says he's not in a gang, but the tattoos don't mean that he's in a gang.  I guess that's somewhat disputable.
>
> And this issue of self-defense, I guess, if - - if you think - - think about that it isn't real probable to me that if it's just self-defense you're going to go through someone's pockets and take the wallet. I understand him driving away in a car because he needed to get somewhere perhaps, but the issue of where this wallet was and him taking it is a little disturbing if it's just a self-defense claim.
>
> And is it likely that a 64 year old man would follow a guy down the stairs that's holding a gun to him minutes before

---

[3] This court notes that the United States Supreme Court has chosen to substitute the term "intellectual disability" for "mental retardation." *Hall v. Florida*, __ U.S. __, 134 S.Ct. 1986, 1990 (2014). While this court agrees that sensitivity is due in any discussion of mental disabilities, the Ohio Revised Code and the records in this case use the term "retarded." Thus, for clarity, we reiterate what has been stated previously with a preference for use of the former and with no pejorative connotation intended. *See State v. Nelson*, 10th Dist. No. 14AP-229, 2014-Ohio-5757, ¶ 3, fn. 1.

and he's - - yet he's following him. It - - it - - that doesn't make a lot of sense, nor does it that if Joseph were threatened he didn't run out the door. So that's - - that's a little puzzling. Obviously we don't have all of the evidence, but I can't draw this conclusion that it's just a shut case that it's - - that it's self-defense. I mean, do I think he intended to kill this gentleman? I - - I don't. There is, you know, possibility their - - their proposition is that it's a robbery that went wrong. And it was clearly not preplanned this man came to their home.

* * *

[T]he factors that are indicated to transfer him to adult court would be that there was grievous harm on Mr. Hines. He was killed, and his age was making him a vulnerable person. He was 64 although perhaps Joseph didn't know his age. There was no gang involvement in this particular incident, but a firearm was used. And Joseph was out on a warrant, living in his home and yet his family had not turned him in after cutting off an ankle monitor. So he was out there on a warrant which is - - those are - - the no gang involvement is a factor against - - you know - - in this particular crime, no gang involvement, against transfer; however, the other ones are positive factors for transferring him. Whether he's emotionally mature enough at age almost 15 when this happened and now I think close to 16 is questionable although I would say he's had sexual relations, dropped out of school it sounds like, and involved in selling drugs; but it - - emotionally mature at almost 15, almost 16, that might be a factor weighing against transfer, but there's plenty that say - - of factors saying that are for the transfer.

Factors against transferring him to adult court would be that the victim caused or provoked this incident; obviously that's Joseph's argument at this point and - - and that will be at a, you know, potential jury trial down the road, but at this point there's no evidence of that other than the - - the - - what he says which conflicts with the statement his - - his grandmother gave. So - - and - - and what I think is sort of the reality of - - or the prob - - the likelihood that a man that's been held at a gun would follow a - - a young man down the stairs.

He was - - Joseph was the primary offender. He was not a, you know, a bystander, and there was physical harm done to this gentleman and Joseph has been adjudicated in the past. The maturity on that one is again another factor which I would say of any of the issues is, you know, borderline, but that - - that

isn't a real - - that isn't the only factor that I have to consider. And he has no real mental illness. And then there is the - - the big question, is there sufficient time, just - - just if we would hold him to age 21 in the juvenile system to, you know, make him safe for society, basically to rehabilitate him. And then we have Dr. Speicher's report * * *.

* * *

And Dr. Speicher's report, while she does say he's amenable to care, it's not the strongest report because he has some moderate risks and perhaps didn't know the full story. Although some of the violence that he was supposedly involved in as a younger age, I didn't put a whole lot of weight in that, but I do put more weight in the more recent things that he's done and - - and, you know, the fact that there's no family structure that helps him get through any juvenile sanctions that were successful, because none of them were and I guess because - - because I - - I fear the safety of the community in this case is weighing heavily on my mind, and the fact that it was such a - - you know, it's a death. It's - - it's a death crime.  And for those reasons I'm going to bind him over to adult court.  It's - - it's a - - it's a really serious crime. Obviously there's - - the full story hasn't come out; there's other evidence, there's other witnesses and - - and that kind of thing that will be - - that will be heard, but - - so, I - - I will find that he's not amenable to care/rehabilitation in a facility designed for the care supervision or rehabilitation of delinquent children and that the safety of the community requires that he be placed under legal restraint for a period extending beyond the age of his majority.

(Jan. 16, 2014 Tr. 41-43, 46-49.)

{¶ 21} In the more detailed of its two written entries, the juvenile court stated:

The Court finds that as to the factors in favor of transfer to adult court: whether there was grievous harm to the victim; he was killed. The victim's age of 64 makes him a vulnerable person. There was no gang involvement in his particular incident but a firearm was used. Joseph was out on a warrant; living in his home and yet his family had not turned him in after cutting off the EMD. The fact that there is no gang involvement in this particular case is a factor weighing against transfer but the other factors are positive for transferring him. Whether he is emotionally mature enough at the age of 14 at the time of the incident and now 15 is questionable and might be a factor weighing against transfer although he has had

> sexual relations, dropped out school, and is involved in selling drugs, which would indicate some mature acts. However, there are plenty of factors that weigh in favor of the transfer, primarily the seriousness of the crime.
>
> Factors against transferring Joseph to adult court: whether the victim caused or provoked this incident. Obviously that is Joseph's argument but at this point there is no evidence of that, other than what Joseph says which conflicts with the statement his grandmother gave. Joseph was the primary offender. He was not a bystander. There was physical harm done to the victim. Joseph has been adjudicated in the past. Joseph's maturity is again another factor which is border line. Joseph has no mental illness.
>
> * * *
>
> The Court fears for the safety of the community and believes because this is a very serious crime that involved someone's death, Joseph Reeder, is not amenable to rehabilitation within the juvenile system and will bind him over for trial to the General Division of the Court of Common Pleas for criminal prosecution as an adult.

(Feb. 4, 2014 Judgment Entry.)

{¶ 22} Breaking this down by factors, the juvenile court found that Hines was killed, thus finding R.C. 2152.12(D)(1) satisfied and (E)(4) unsatisfied. The juvenile court found that Hines was vulnerable due to his age and physical condition consistent with R.C. 2152.12(D)(2). It found that there was no relationship between Hines and Reeder and thus that R.C. 2152.12(D)(3) was unsatisfied. It remarked that, while Reeder might be associated with a gang, this crime was not gang activity, and hence, R.C. 2152.12(D)(4) was not satisfied. It noted that Hines was killed with a gun and thus R.C. 2152.12(D)(5) was fulfilled. It also noted that Reeder had been placed by the juvenile court on home incarceration, known as "house arrest," but he had cut off an ankle monitor, and a warrant had been issued by the court for his arrest at the time he committed this offense, meeting R.C. 2152.12(D)(6). The juvenile court acknowledged that its expert had opined that there was a likelihood that Reeder could be rehabilitated in the juvenile system, but the court reached a different conclusion, because the expert report did not strongly support that conclusion, and her testimony at the hearing suggested that the expert may not have had all the relevant facts, and considering the extremely serious nature of the

crime, thereby addressing R.C. 2152.12(D)(7), (9), and (E)(8). The juvenile court considered Reeder's maturity and reasoned that his young age, when juxtaposed with some of his mature activities (sexual activity, for instance) prevented a definitive conclusion. Thus, the juvenile court considered both R.C. 2152.12(D)(8) and (E)(6) and failed to find either factor satisfied.

{¶ 23} When considering factors weighing against transfer, the juvenile court considered Hines' role in the offense, acknowledging that Hines went to the house to purchase drugs and that Reeder was alleging self-defense, but ultimately the court failed to reach a definitive conclusion as to R.C. 2152.12(E)(1) and (2). The trial court acknowledged that Reeder was the principal actor charged, which negated R.C. 2152.12(E)(3). The court addressed R.C. 2152.12(E)(4) when considering R.C. 2152.12(D)(1) and the fact that Hines was killed. It addressed Reeder's criminal history and his having cut-off an ankle monitor and being a fugitive, thus addressing R.C. 2152.12(E)(5). The juvenile court discussed Reeder's maturity in keeping with R.C. 2152.12(E)(6) and (D)(8). The juvenile court found, consistent with the evidence and R.C. 2152.12(E)(7), that Reeder had no mental illness. Finally, it discussed the likelihood of Reeder's rehabilitation within the juvenile system in accordance with R.C. 2152.12(E)(8) as well as (B)(3), (D)(7), and (9).

{¶ 24} The records of the hearing, moreover, generally support the trial court's reasoning. Reeder admitted in a taped interview that he killed Hines by shooting him. R.C. 2152.12(D)(1) and (5), and (E)(3) and (4). Reeder admitted in the same interview that his tattoos resemble gang tattoos but denied bona fide membership. R.C. 2152.12(D)(4). Testimony and an autopsy report were presented and considered regarding Hines' age and health. R.C. 2152.12(D)(2). The testimony of the investigating detective and Reeder's own statement made clear that Hines had come to the house and why. R.C. 2152.12(D)(3) and (E)(1). Reeder's statements and the testimony of the investigating detective and crime scene investigator explored Reeder's allegation that he was provoked and that the killing was an act of self-defense. R.C. 2152.12(E)(2). In addition, the trial court's expert provided a report and testimony regarding Reeder's criminal background, incidents during his upbringing, mental acuity, maturity, and amenability to rehabilitation in the juvenile system. R.C. 2152.12(D)(6) through (9);

(E)(5) through (8).  Although the juvenile court ultimately disagreed with the expert as to the final conclusion about amenability, it explained its reasons, and we have explained on prior occasions that "the juvenile court 'is not bound by expert opinion, and may assign any weight to expert opinion that it deems appropriate.' "  *State v. Morgan*, 10th Dist. No. 13AP-620, 2014-Ohio-5661, ¶ 37, quoting *State v. West*, 167 Ohio App.3d 598, 2006-Ohio-3518, ¶ 30 (4th Dist.).

{¶ 25} The decision to bindover a 14-year-old who shot an unwelcome visitor (or even attacker) and alleged self-defense was clearly difficult for the juvenile court, and there was certainly room for that court to have reached a different conclusion.  However, the juvenile court ordered the proper evaluations, held a lengthy four-day hearing, considered the applicable statutory factors, and made a difficult decision.  The record is not insufficient under R.C. 2152.12(B)(3), and we find that the juvenile court did not abuse its discretion.  We overrule both of Reeder's assignments of error.

## IV.  CONCLUSION

{¶ 26} The record in this case and the findings of the juvenile court were sufficient to show that the appropriate statutory factors set forth in R.C. 2152.12 were considered.  Moreover, although the juvenile court could also have chosen to exercise its discretion in a different way, the record in this case supports the decision the juvenile court rendered.  There was no abuse of discretion here.  Reeder's two assignments of error are overruled, and we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

TYACK and KLATT, JJ., concur.

––––––––––––––