[Cite as *State v. Curtis*, 2016-Ohio-6978.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,               CASE NO. 1-15-55

     v.

CELEEL D. CURTIS,                  O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR20150044

Judgment Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Decision: September 26, 2016

APPEARANCES:

    *Katherine R. Ross-Kinzie and Charlyn Bohland* for Appellant

    *Terri L. Kohlrieser* for Appellee

Case No. 1-15-55

**SHAW, P.J.**

{¶1} Defendant-appellant, Celeel[1] Curtis ("Curtis"), brings this appeal from the July 27, 2015, judgment of the Allen County Common Pleas Court sentencing Curtis to an aggregate 27-year prison term after Curtis was found guilty in a jury trial of Aggravated Burglary in violation of R.C. 2911.11(A)(1), a felony of the first degree, Kidnapping in violation of R.C. 2905.01(A)(4), a felony of the first degree, Rape in violation of R.C. 2907.02(A)(2), a felony of the first degree, and Robbery in violation of R.C. 2911.02(A)(2), a felony of the second degree.

*Relevant Facts and Procedural History*

{¶2} On September 16, 2014, in the early afternoon hours, Curtis and a friend he called "Jay"[2] were walking past the home of I.S. and I.S.'s husband in Lima, Ohio. Curtis and Jay decided to burglarize I.S.'s residence, so they climbed into the house through a window. Curtis was approximately 3 months shy of being 18 years old at the time.

{¶3} I.S. was not home when Curtis and Jay initially entered her residence. I.S.'s sister had recently died and I.S. was helping her brother-in-law clear some

---

[1] There was an early dispute in this case over the spelling of Curtis's first name. At Curtis's first hearing, he stated that he spelled his name "Caleel" even though his birth certificate showed "Celeel." Curtis's mother indicated that Curtis's name was spelled "correctly" as "Caleel" on his social security card and that the birth certificate spelling was incorrect. The juvenile court, and later the common pleas court, elected to proceed with the spelling "Celeel" based on the birth certificate. Regardless, we will refer to him as Curtis.
[2] This is a phonetic spelling based on Curtis's interrogation video.

-2-

things out of his nearby home. I.S.'s husband was also not at home, as he was at work at the time Curtis entered the residence.

{¶4} Once Curtis was inside the residence, he took multiple items from I.S. including a pair of earrings, a necklace, and a Samsung Galaxy tablet. While Curtis was still inside the residence, I.S. returned home. According to Curtis, Jay left through the window they had entered from when I.S. returned. However, Curtis stated that he was unable to exit, so he attempted to hide in a closet.

{¶5} I.S. indicated that when she returned home there were flowers on her front porch from a friend for her sister's passing. I.S. picked up the flower arrangement and brought it inside to take a picture of it to display on social media with a "thank you."

{¶6} Upon entering her home, I.S. deactivated her home security system. The security system did not cover I.S.'s bedroom window, as she believed it to be too high for anyone to enter her home through. I.S. then went to her home-office to take a picture of the flowers and upload the picture.

{¶7} While in her office, I.S. caught sight of Curtis attempting to hide in her closet. Curtis then came out of the closet, grabbed I.S. from behind, and struck her multiple times in the side. I.S. was bruised as a result of these strikes.

{¶8} I.S. screamed and asked Curtis who he was and why he was in her house. Curtis threatened her, telling her to be quiet or he would kill her. Curtis

indicated that he wanted to leave through the back door, so he told I.S. to take him there.

{¶9} Still being restrained, I.S. took Curtis toward the home's rear entrance; however, before they got there, they passed I.S.'s bedroom and Curtis pushed I.S. inside onto the bed.

{¶10} I.S. was then choked, beaten, and vaginally penetrated by Curtis. I.S. indicated that the sexual assault lasted fifteen or twenty seconds and that Curtis ejaculated. I.S. stated that she fought Curtis throughout the assault, biting him and scratching him, but she was terrified and at one point Curtis shoved a blanket in her mouth. She also testified that Curtis hit her in the neck and face. I.S. had numerous bruises as a result of being held down, choked, and struck during this incident, and the bruises were photographed.

{¶11} I.S. testified that she focused on Curtis's face and what he was wearing during the sexual assault so that she could identify him. I.S. testified that Curtis was wearing a green Boston Celtics hat with a black under-bill that had "Celtics" written on it. She testified that Curtis had on black pants with white shorts underneath and that he was wearing a dark-colored backpack.

{¶12} During the assault, I.S. indicated that when she could speak or scream, she repeatedly asked Curtis who he was and why he was doing this to her. I.S. also testified that she asked Curtis why he was not in school because he looked so young.

{¶13} After the sexual assault, I.S. testified that she told Curtis she had money in her purse in the kitchen in an attempt to get Curtis to leave. I.S. testified that Curtis then grabbed her by her arm and her neck, took her off the bed into the kitchen and emptied the contents of her purse, taking some money that was in there. As Curtis was doing that, I.S. went to her alarm and pushed the buttons repeatedly until the alarm went off. When the alarm sounded, Curtis ran to the back door but could not get it open so he left through the window he had entered the house from. I.S. watched the direction Curtis ran.

{¶14} Police promptly responded to the scene and I.S. was soon taken to St. Rita's hospital in Lima where a Rape Kit was performed. I.S. provided as much detail as she could to the Lima Police Department regarding the incident, her assailant, and which direction he had gone upon leaving her house.

{¶15} Detective Timothy Scott Clark canvassed the area, following what he felt was a logical path to flee from I.S.'s residence if he knew the police were coming. Detective Clark proceeded a few blocks to apartments on Brower Road. He stopped there to ask the employees if they had seen anyone meeting the assailant's description with his clothing. Detective Clark thought the green Celtics hat would stand out because there were not a lot of them in the area. The employees had not seen anything, so Detective Clark went back outside and at that time he spotted an individual wearing a green Celtics hat and white shorts getting into the

rear of a vehicle with three other individuals. Detective Clark felt that the individual was likely I.S.'s assailant, so he followed the vehicle in his unmarked cruiser.

{¶16} Detective Clark radioed for a marked police unit to stop the vehicle. As a marked police officer approached, Detective Clark observed the individual in the back seat take off his green hat. The vehicle was then stopped by a Lima City Police Officer and Curtis was taken out of the back of the vehicle.

{¶17} In the seat where Curtis was sitting in the vehicle, two earrings were found, which were identified to belong to I.S. Curtis also had a necklace attached to the back of his white shorts when he was removed from the vehicle. Photographs were taken of the earrings and the necklace attached to Curtis's shorts. Curtis was then taken into custody and transported for interrogation.

{¶18} Curtis's interrogation was videotaped, and later introduced into the trial. In the interrogation, Curtis was initially informed of his *Miranda* rights, then he later was informed of his rights again, and he signed a written waiver of his rights. During the interrogation, Curtis readily admitted to burglarizing I.S.'s residence. He also eventually admitted to the sexual assault. DNA swabs were taken from Curtis and they were compared to the samples taken from I.S. in the Rape Kit.

{¶19} On September 22, 2014, a complaint was filed in the Allen County Common Pleas Court, Juvenile Division, alleging that Curtis was delinquent by means of committing Rape in violation of R.C. 2907.02(A)(2), a first degree felony

if committed by an adult, Aggravated Burglary in violation of R.C. 2911.11(A)(1), a first degree felony if committed by an adult, and Aggravated Robbery in violation of R.C. 2911.01(A)(3), a first degree felony if committed by an adult. The complaint also requested a permissive bindover to the general division of the common pleas court pursuant to R.C. 2151.12(B). Curtis denied the allegations.

{¶20} A probable cause hearing was then held on November 7, 2014, in the Allen County Juvenile Court. I.S. testified at the hearing, as did the Sexual Assault Nurse Examiner ("SANE") who performed the Rape Kit. Detective Timothy Scott Clark of the Lima Police Department also provided testimony on behalf of the State. Ultimately the juvenile court determined that probable cause existed to believe that Curtis committed the offenses and ordered that Curtis be evaluated by a psychologist for purposes of determining Curtis's amenability to treatment and rehabilitation in the juvenile system.

{¶21} The amenability hearing was held January 28, 2015. At the hearing, Steve Brown, the director of detention services for the Allen County Juvenile Detention Center, testified that Curtis had eight major rule violations and eight general rule violations so far in his stay in the detention center.

{¶22} Dr. Charlene Cassel, a court diagnostic and treatment psychologist, testified that she performed a forensic evaluation of Curtis. Dr. Cassel was classified as an expert in forensic psychology. Dr. Cassel testified that Curtis had a

number of offenses as a juvenile and that the offenses were escalating in severity. Dr. Cassel testified that Curtis took no responsibility for his actions, and that he had failed to be rehabilitated in the juvenile system in two states and three separate jurisdictions.

{¶23} Dr. Cassel testified that Curtis was impulsive and had an IQ composite of 75, and that there was a 90% confidence that his IQ was between 69-83. Curtis's IQ placed him somewhere in the range of "borderline" mental retardation to average intelligence. (Jan. 28, 2015, Tr. at 38). However, Dr. Cassel testified that Curtis was functioning more like an average individual, and that Curtis's school achievement was much lower than his "street smart[s]." (*Id.*)

{¶24} Dr. Cassel testified that Curtis had failed to be rehabilitated despite juvenile treatment in multiple jurisdictions. In addition, Dr. Cassel testified that there was not enough time to change Curtis's behavior in the juvenile system and that she did not know that a successful treatment existed for Curtis. Ultimately Dr. Cassel testified that Curtis was not amenable to treatment in the juvenile system.

{¶25} Curtis then called his mother, Sonya Curtis, to testify on his behalf in opposing a transfer to the general division of the common pleas court. Sonya testified that Curtis was rebellious and that he likely would not agree to treatment, but she did not think the case should be transferred. Sonya testified that she did not think Curtis could live on his own even though he had spent time not living with her

-8-

previously. Sonya testified that she did not let Curtis drive and that she had to tell him to shower and pick up his things.

{¶26} On February 5, 2015, based on the evidence that had been presented, the juvenile court determined that Curtis was not amenable to treatment and rehabilitation in the juvenile system and ordered that the case be transferred to the General Division of the Allen County Common Pleas Court.

{¶27} On March 12, 2015, Curtis was indicted in the Allen County Common Pleas Court for Aggravated Burglary in violation of R.C. 2911.11(A)(1), a felony of the first degree, Kidnapping in violation of R.C. 2905.01(A)(4), a felony of the first degree, Rape in violation of R.C. 2907.02(A)(2), a felony of the first degree, and Robbery in violation of R.C. 2911.02(A)(2), a felony of the second degree. Curtis pled not guilty to the charges.

{¶28} On April 13, 2015, Curtis filed a motion to suppress the statements he made to officers during his custodial interrogation.

{¶29} On April 24, 2015, a hearing was held on Curtis's motion to suppress. The State conceded at the hearing that Curtis was in custody at the time of his interrogation. At the hearing, Detective Steven Stechschulte testified that he interrogated Curtis on September 16, 2014. Detective Stechschulte testified that Curtis had been given his *Miranda* rights multiple times. He testified that he advised Curtis of his *Miranda* rights when Curtis was initially apprehended, then again prior

to the beginning of the custodial interrogation, and yet another time when the interrogation actually began. Detective Stechschulte also testified that Curtis signed a written waiver of his right to remain silent, which was entered into evidence.

{¶30} Detective Stechschulte testified that the interrogation lasted approximately an hour to an hour and fifteen minutes, that Curtis appeared sober and responsive and that Curtis never requested counsel and he never requested to terminate the interrogation despite clearly understanding his ability to do so. A recording of the full interrogation was introduced into evidence at the suppression hearing.

{¶31} On May 7, 2015, the trial court filed an entry overruling Curtis's motion to suppress.

{¶32} The case then proceeded to a jury trial, which was held June 22-23, 2015. At trial the State called eight witnesses including the victim, I.S., the detectives and officers involved in this case, the SANE, a BCI analyst, and a forensic scientist who testified that the sperm DNA and the DNA taken from I.S.'s fingernail scrapings were consistent with Curtis's DNA.[3] The forensic scientist testified to a

---

[3] The analyst testified that if the DNA did not match, Curtis would be excluded; however, the DNA taken from Curtis's cheek swab and from the sperm taken from the Rape kit showed that Curtis was "included with a statistic of one in * * * one sextillion, six hundred thirty-six quintillion in the sperm fraction," which meant that the analyst "would have to test one sextillion six hundred and thirty-six quintillion random individual's DNA in order to find one [other] person's DNA that matches the evidence sample."[3] (Tr. At 362-364).

reasonable degree of scientific certainty that Curtis's DNA was a "match" to the evidence and that the DNA belonged to Curtis. (Tr. at 364-365).

{¶33} After the State rested its case, Curtis elected not to call any witnesses and also rested. The parties then proceeded to closing arguments, instructions were given, and the case was turned over to the jury. The jury found Curtis guilty of all four counts against him.

{¶34} On July 22, 2015, the case proceeded to sentencing. At the sentencing hearing the State recommended maximum consecutive sentences based on Curtis's prior adjudications of delinquency and the heinous nature of the crimes in this case. The State emphasized, through a victim impact statement, the traumatic impact the crimes had upon the victim. However, the State conceded that the Rape and Kidnapping charges should merge and elected to proceed to sentence on the Rape charge.

{¶35} The trial court agreed that the Rape and Kidnapping charges merged and specifically found that none of the other crimes should merge for the purposes of sentencing.[4] Curtis was then sentenced to serve 10 years in prison on the Aggravated Burglary charge, 11 years in prison on the Rape charge, and 6 years in prison on the Robbery charge for an aggregate prison sentence of 27 years. Curtis was also classified as a Tier 3 sex offender.

---

[4] The trial judge noted that upon reading the victim impact statement that the impact was among the worst the judge had ever seen in a case that was not a homicide.

{¶36} Curtis then filed a notice of appeal, appealing his convictions to this Court.[5]

{¶37} After Curtis filed his notice of appeal, Curtis filed a motion for jail-time credit arguing that he should receive credit for days he spent in a juvenile facility on these charges prior to trial. On September 3, 2015, despite the appeal pending before this Court, the trial court granted Curtis's motion for additional days of jail-time credit.

{¶38} On appeal, Curtis now asserts the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE JUVENILE COURT ABUSED ITS DISCRETION WHEN IT DETERMINED THAT CELEEL CURTIS WAS NOT AMENABLE TO TREATMENT IN THE JUVENILE JUSTICE SYSTEM, IN VIOLATION OF R.C. 2152.12(B); FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; AND, ARTICLE I, SECTION 10, OHIO CONSTITUTION.**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT ERRED WHEN IT FAILED TO SUPPRESS STATEMENTS MADE BY CELEEL IN VIOLATION OF HIS RIGHTS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S.**

---

[5] Following the trial, the State filed a clarification related to the DNA analysis that had been presented at trial. The State indicated that there had been a miscalculation of the numbers related to the DNA probability presented. Instead of the vaginal sample reflecting 1 in 1,636,000,000,000,000,000,000, it should have read 1 in 1,607,000,000,000,000,000,000, and instead of the fingernail scrapings being 1 in 95,600,000,000,000,000, it should have been 1 in 93,020,000,000,000,000. On the basis of these new calculations, Curtis filed a motion for a new trial.

The trial court denied Curtis's motion for a new trial, finding that the change was marginal considering that both calculations exceeded the world's population many, many times over.

CONSTITUTION AND ALLOWED THOSE STATEMENTS TO BE INTRODUCED AT TRIAL.

**ASSIGNMENT OF ERROR 3**
THE TRIAL COURT ERRED IN VIOLATION OF CELEEL'S RIGHTS UNDER THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION, ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION, AND R.C. 2941.25, WHEN IT FAILED TO MERGE FOR SENTENCING OFFENSES THAT HAD SIMILAR IMPORT, AROSE FROM THE SAME CONDUCT, AND WERE NOT COMMITTED SEPARATELY OR WITH A SEPARATE ANIMUS.

**ASSIGNMENT OF ERROR 4**
THE TRIAL COURT ERRED WHEN IT FAILED TO CALCULATE AND INCLUDE IN ITS SENTENCING ENTRY THE NUMBER OF DAYS OF CREDIT CELEEL WAS ENTITLED TO UNDER R.C. 2967.191.

**ASSIGNMENT OF ERROR 5**
THE TRIAL COURT ERRED WHEN IT CLASSIFIED CELEEL CURTIS AS A TIER III SEX OFFENDER REGISTRANT, AS DEFINED IN R.C. 2950.01(G)(1), BECAUSE THE IRREBUTTABLE PRESUMPTION IN OHIO'S ADULT REGISTRATION SCHEME VIOLATES A CHILD'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION; AND, ARTICLE I, SECTION 2, OHIO CONSTITUTION.

**ASSIGNMENT OF ERROR 6**
THE TRIAL COURT ERRED WHEN IT CLASSIFIED CELEEL CURTIS AS A TIER III SEX OFFENDER REGISTRANT AS DEFINED IN R.C. 2950.01(G)(1), BECAUSE THE AUTOMATIC AND MANDATORY LIFETIME CLASSIFICATION OF JUVENILE OFFENDERS IS CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION; AND, ARTICLE I, SECTION 9, OHIO CONSTITUTION.

**ASSIGNMENT OF ERROR 7**
**CELEEL CURTIS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO OBJECT TO THE IMPOSITION OF AN UNCONSTITUTIONAL CLASSIFICATION IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; AND, ARTICLE I, SECTIONS 9 AND 10, OHIO CONSTITUTION.**

{¶39} We elect to address some of the assignments of error together and out of the order in which they were raised.

*First Assignment of Error*

{¶40} In Curtis's first assignment of error, he argues that his case should not have been transferred from juvenile court to the general division of the common pleas court. Specifically, Curtis contends that the juvenile court failed to consider alternative juvenile dispositions that could rehabilitate him, and that the juvenile court failed to consider how Curtis would fare in the criminal justice system.

{¶41} "[A] juvenile court's determination regarding a child's amenability to rehabilitation in the juvenile system is reviewed by an appellate court under an abuse-of-discretion standard." *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, ¶ 14, citing *In re A.J.S.,* 120 Ohio St.3d 185, 2008-Ohio-5307, ¶¶ 39-40. " 'A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary.' " *State v. Keenan*, 143 Ohio St.3d 397, 2015-Ohio-2484, ¶ 7, quoting *State v. Darmond,* 135 Ohio St.3d 343, 2013-Ohio-966, ¶ 34, citing *State v. Adams,* 62 Ohio St.2d 151 (1980).

{¶42} Curtis was a juvenile when he committed the offenses in this case. Curtis was born in late December of 1996 and the offenses took place in September of 2014, so he was just over 3 months shy of turning 18. When the complaint was filed against Curtis in juvenile court, a permissive transfer was requested pursuant to R.C. 2152.12(B), which reads,

> **(B) Except as provided in division (A) of this section, after a complaint has been filed alleging that a child is a delinquent child for committing an act that would be a felony if committed by an adult, the juvenile court at a hearing may transfer the case if the court finds all of the following:**
>
> **(1) The child was fourteen years of age or older at the time of the act charged.**
>
> **(2) There is probable cause to believe that the child committed the act charged.**
>
> **(3) The child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions. In making its decision under this division, the court shall consider whether the applicable factors under division (D) of this section indicating that the case should be transferred outweigh the applicable factors under division (E) of this section indicating that the case should not be transferred. The record shall indicate the specific factors that were applicable and that the court weighed.**

{¶43} Curtis does not allege any fault with the juvenile court's determination with regard to R.C. 2152.12(B)(1) and (B)(2) in the permissive transfer, as Curtis was over the age of 14 and a probable cause hearing was held wherein it was determined that probable cause existed to believe that Curtis committed the alleged

acts. Rather, Curtis focuses his argument on R.C. 2152.12(B)(3), contending that the trial court failed to adequately examine whether Curtis was amenable to some form of treatment in the juvenile system.

{¶44} In order for a juvenile court to determine if a transfer to the general division of the common pleas court is appropriate, Revised Code 2152.12(D) and (E) provide a number of factors for consideration. Subsection (D) provides the following:

> **(D)  In considering whether to transfer a child under division (B) of this section, the juvenile court shall consider the following relevant factors, and any other relevant factors, in favor of a transfer under that division:**
>
> **(1)  The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.**
>
> **(2)  The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.**
>
> **(3)  The child's relationship with the victim facilitated the act charged.**
>
> **(4)  The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.**
>
> **(5)  The child had a firearm on or about the child's person or under the child's control at the time of the act charged * * * [.]**
>
> **(6)  At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.**

-16-

**(7)  The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.**

**(8)  The child is emotionally, physically, or psychologically mature enough for the transfer.**

**(9)  There is not sufficient time to rehabilitate the child within the juvenile system.**

**{¶45}** The juvenile court should then consider the following factors in R.C. 2152.12(E) weighing against a transfer to the general division of the common pleas court.

**(E)  In considering whether to transfer a child under division (B) of this section, the juvenile court shall consider the following relevant factors, and any other relevant factors, against a transfer under that division:**

**(1)  The victim induced or facilitated the act charged.**

**(2)  The child acted under provocation in allegedly committing the act charged.**

**(3)  The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.**

**(4)  The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.**

**(5)  The child previously has not been adjudicated a delinquent child.**

**(6)  The child is not emotionally, physically, or psychologically mature enough for the transfer.**

**(7)   The child has a mental illness or is a mentally retarded person.**

**(8)   There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.**

{¶46} In this case the trial court held a hearing on Curtis's amenability to treatment in the juvenile system and heard the testimony of Steve Brown, the director of detention services for the Allen County Juvenile Detention Center, Dr. Charlene Cassel, a court diagnostic and treatment psychologist, and Sonya Curtis, Curtis's mother.  Following the hearing, the trial court issued an entry finding that Curtis was not amenable to treatment in the juvenile system.  In doing so, the trial court thoroughly analyzed the factors in R.C. 2152.12(D) and (E) and made the following relevant findings based on the evidence presented.

> **The Court finds that the victim * * * suffered significant psychological harm as well as physical harm as a result of the commission of the offenses alleged.   *   * * (R.C. Section 2152.12(D)(1)).    The child has had numerous delinquency adjudications in the State of Michigan and has served detention time, and time under probation supervision in that state.   It appears from the Social History that he was on unsupervised probation supervision in the State of Michigan at the time of the alleged * * * offenses (R.C. Section 2152.12(D)(6)).  The Child was on probation under court supervision at various times from the age of 13 years.  He was in secure custody in various juvenile detention facilities in Ohio and Michigan for most of the calendar year 2014.    He has had at least five prior delinquency adjudications.   One of the prior delinquencies involved assault and battery.  Two of the prior adjudications were for breaking and entering and another was a theft offense, receiving stolen**

**property. \* \* \* His mother's testimony confirmed that he has never been willing to participate in any rehabilitative or treatment services while under the supervision of juvenile authorities and has resisted any efforts geared toward treatment. The Court concludes that the results of all previous juvenile sanctions indicate that the rehabilitation of the child will not occur in the juvenile system. (R.C. 2152.12(D)(7)). Given the prior efforts at rehabilitation, the Court concludes that there is insufficient time in which to rehabilitate the Child in the juvenile justice system and that the level of security available in the juvenile system does not provide a reasonable assurance of public safety (R.C. Section 2152.12(D)(9) and (E)(8)). \* \* \* Finally, the Child was 17 years and 9 months of age when he allegedly committed the offense, is now 18 years of age, and is emotionally, physically, and psychologically mature enough for the transfer (R.C. Section 2152.12(D)(8)).**

{¶47} The court also noted factors favorable to Curtis, determining that R.C. 2152.12 factors (D)(3) and (D)(4) were not present in this case. However, further supporting the juvenile court's decision to transfer, the juvenile court found that the victim did not induce or facilitate the offense, that Curtis was not under provocation, that Curtis was a principal actor, that Curtis did cause physical and psychological harm, and that he had numerous prior adjudications as a delinquent child. R.C. 2152.12(E)(1)-(5).

{¶48} The court also noted that it was persuaded by Dr. Cassel's assessment that Curtis's criminal activity was escalating and her opinion that Curtis was not amenable to treatment in the juvenile justice system.[6]

---

[6] In fact, Dr. Cassel specifically opined that even given more time she did not know that a successful treatment for Curtis existed at all. (Tr. at 52).

{¶49} Curtis argues on appeal that we should find that the trial court abused its discretion because the trial court did not consider other dispositions that would be available to rehabilitate Curtis in the juvenile system. However, the trial court was clearly persuaded by the fact that Curtis had been through the juvenile system numerous times and had not been rehabilitated, that Curtis's own mother stated that Curtis would not commit to rehabilitation, that Curtis's crimes were escalating in severity, and that the forensic psychologist opined that, in her expert opinion, Curtis was not amenable to treatment in the juvenile justice system.

{¶50} It is evident from the juvenile court's entry on the matter that the court also found that Curtis, being so close to 18 years of age, was simply not amenable to treatment in the juvenile justice system given the testimony presented. The trial court was not required to individually analyze each and every possible avenue for juvenile rehabilitation and decide that Curtis was not amenable to them.

{¶51} The trial court was required to weigh the factors of R.C. 2152.12(D) and (E) and make a determination, which it did. The trial court's findings related to the factors were clearly supported by the record, and were noted in the trial court's thorough judgment entry, therefore we cannot find that it abused its discretion on this issue. Curtis's argument is thus not well-taken.

{¶52} Curtis next argues that the juvenile court did not consider how Curtis would fare in the criminal justice system. Again, the trial court thoroughly reviewed

and analyzed the appropriate factors and there was ample evidence to support the trial court's decision. The trial court is also not required to make a specific finding related to Curtis and how he would fare in the criminal justice system. Nevertheless, it is implicit in the trial court's finding that Curtis could not be rehabilitated in the juvenile justice system. The trial court also specifically noted that Curtis was physically and psychologically mature enough for the transfer. Therefore, Curtis's argument on this issue is similarly not well-taken, and his first assignment of error is overruled.

*Second Assignment of Error*

**{¶53}** In Curtis's second assignment of error he argues that the trial court erred by overruling his suppression motion. Specifically, Curtis argues that since he was a juvenile at the time of his custodial interrogation, the trial court did not properly examine the totality of the circumstances when deciding whether Curtis knowingly, intelligently, and voluntarily waived his *Miranda* rights. In addition, Curtis argues that he did not have access to his parent or guardian at the time of his interrogation, which should have been a stronger factor in weighing the totality of the circumstances.

**{¶54}** "To determine whether a suspect knowingly, intelligently, and voluntarily waived his *Miranda* rights, courts examine the totality of the circumstances." *State v. Baker*, --- Ohio St.3d ---, 2016-Ohio-2708, ¶ 24 citing *State*

*v. Clark,* 38 Ohio St.3d 252, 261 (1988). When the suspect is a juvenile, the totality of the circumstances includes " 'the juvenile's age, experience, education, background, and intelligence" as well as his "capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " *Id.* at ¶ 24, quoting *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560 (1979). A juvenile's access to advice from a parent, guardian or custodian also plays a role in assuring that the juvenile's waiver is knowing, intelligent, and voluntary. *Baker* at ¶ 24, citing *In re C.S.,* 115 Ohio St.3d 267, 2007-Ohio-4919, ¶ 96.

{¶55} In this case, the State concedes that Curtis was in custody when he was interrogated by the Lima City Police Department. The State argues, however, that Curtis was clearly informed of his *Miranda* rights, that he understood them, and that he signed a written waiver of those rights. The State maintains that under the totality of the circumstances, Curtis's statement was knowing, intelligent, and voluntary and that the trial court was correct in overruling Curtis's suppression motion. We agree.

{¶56} At the suppression hearing, the State called Detective Steven Stechschulte, who conducted Curtis's custodial interrogation. Detective Stechschulte testified that he initially interacted with Curtis when Curtis's vehicle was pulled over by the police. Detective Stechschulte testified that he advised Curtis at the scene of his *Miranda* rights, his right to counsel, and his right to remain

silent. Detective Stechschulte testified that Curtis did not make any statements at the scene and that Curtis was then transported to the Lima Police Department for interrogation.

{¶57} Curtis's entire interrogation was recorded, and that recording was introduced into evidence. It lasted approximately one hour and eighteen minutes, though Curtis was not being questioned that entire time. The recording shows that as soon as Curtis was approached in the interrogation room, he was given a verbal admonishment of his rights and the detective ensured that Curtis understood his rights by engaging him in the following discussion.

> **DETECTIVE: You have the right to remain silent, anything you say can and will be used against you in court, you have the right to an attorney if you cannot afford an attorney one will be appointed without any expense to you to represent and advise you. Do you understand those rights?**
>
> **CURTIS: Mmhm. (nodding head).**
>
> **DETECTIVE: Okay so what does that mean? Do you have to talk to me?**
>
> **CURTIS: No.**
>
> **DETECTIVE: No. Okay can you have an attorney?**
>
> **CURTIS: Yes.**
>
> **DETECTIVE: Okay. What if you can't afford one?**
>
> **CURTIS: Ummm I'll be court appointed one.**

> **DETECTIVE: Right. We will pay one—pay for one for ya. And any conversation that we have, is it just going to be a secret between you and me?**
>
> **CURTIS: No.**
>
> **DETECTIVE: Okay, no it can be used against you in court.**

(Apr. 24, 2015 Hr., State's Ex. 1).

{¶58} Following the initial admonishment, DNA samples were then taken from Curtis. After the DNA samples were taken, the detective sat down to interrogate Curtis, and he began by reading Curtis his rights again on an admonishment form, which was introduced into evidence at the suppression hearing. The form reads,

> **It is my duty to advise you that under the constitution of the United States and the Constitution of the State of Ohio, you do not have to make any statement and if you do make a statement, what you do say may be used against you in court. You are further advised that if you do wish to make a statement you have a right to have your attorney present during the taking of this statement and that if you do not have the funds to employ an attorney, then an attorney will be appointed, without any expense to you, to represent and advise you.**

(Apr. 24, 2015, Hr., State's Ex. 2).

{¶59} After the written admonishment on the form, the form contains a written waiver, which reads,

> **I have had my rights shown above read to me. I understand what my rights are. I am willing to answer questions and make a statement. I do not want an attorney at this time. I understand and know what I am doing. No promises or threats have been**

**made to me and no pressure of any kind has been used against me.**

(Apr. 24, 2015, Hr., State's Exs. 1; 2). Curtis signed the waiver in front of the detective on the video. It was also dated and the time was noted. There is no indication of any coercion or pressure in the video. There is also no indication that Curtis was under the influence of any drugs or alcohol or was otherwise of unsound mind.

**{¶60}** Moreover, in addition to the two admonishments in the interrogation room, the detective also made it clear to Curtis again that he could end the interview at any time for *any* reason.

> **DETECTIVE: If sometime during our conversation, you get mad at me, you don't like the color of my shirt, whatever reason, you just say I'm done. Okay, does that sound fair?**
>
> **CURITS: Alright (nodding).**

(Apr. 24, 2015, Hr., State's Ex. 1).

**{¶61}** In overruling Curtis's suppression motion, the trial court indicated that it reviewed the evidence submitted and the relevant law and stated the following.

> **After review the [court] finds that in the interview of September 16, 2014 the Defendant relinquished his Miranda Rights voluntarily and the same was a product of a free deliberate choice and that the Waiver as signed by the Defendant was made with full awareness both of the nature of the rights being abandoned and the consequences of the decision to abandon it.**
>
> **This Court has given particular close scrutiny regarding the knowing, intelligent and voluntary nature of Defendant's actions**

**in light of Defendant's age. This is the conclusion of the Court in all respects even when taken into consideration the minority status of Defendant.**

(Doc. No. 24).

**{¶62}** Curtis now argues on appeal that the trial court did not give enough consideration to several factors when assessing the totality of the circumstances including that Curtis was not given the opportunity to speak with a parent or guardian, that Curtis had, arguably, lower intelligence, and that Curtis's prior involvement in the juvenile system was for offenses "relatively minor" in comparison. Curtis contends that if the trial court had considered these factors in determining the totality of the circumstances, the trial court would have found that Curtis's waiver was not knowing, intelligent and voluntary.

**{¶63}** However, the trial court explicitly stated that it gave close scrutiny to the waiver given that Curtis was a juvenile. Curtis was only 3 months shy of being 18 at the time of the interview, and he had multiple interactions with law enforcement before. Detective Stechschulte made sure that Curtis understood his rights and that he did not have to speak to the police at all. Notwithstanding Curtis's clear understanding, he elected to speak with law enforcement anyway.

**{¶64}** A review of the videotaped interrogation, and the accompanying written waiver, shows absolutely no coercion and a completely voluntary statement from Curtis. Curtis even repeated his understanding of his rights to the detective

and never indicated he was anything less than willing.[7] On the basis of the evidence in the record, we cannot find that the trial court erred by denying Curtis's motion to suppress.[8] Therefore, Curtis's second assignment of error is overruled.

*Curtis's Fifth, Sixth, and Seventh Assignments of Error*

**{¶65}** In Curtis's fifth assignment of error, he argues that the trial court erred when it classified him as a Tier III sex offender because the adult scheme violates a child's right to due process. In Curtis's sixth assignment of error, he contends that automatic and mandatory lifetime classification of "juvenile offenders" is cruel and unusual punishment. In Curtis's seventh assignment of error, he argues that his trial counsel was ineffective for failing to object to Curtis's classification.

**{¶66}** At the outset we note that R.C. 2152.02(C)(4) reads, "Except as otherwise provided * * * any person whose case is transferred for criminal prosecution pursuant to section 2152.12 of the Revised Code shall be deemed after the transfer *not to be a child* in the transferred case." (Emphasis added).

---

[7] Curtis emphasizes multiple times in his brief that Detective Stechschulte offered Curtis a cigarette at the beginning of the interrogation before Detective Stechschulte knew Curtis's age. Curtis argues that this is an indication that he was not treated like a juvenile and afforded extra protection. However, once Detective Stechschulte learned that Curtis was under 18, the detective acknowledged in the video to Curtis that he would not have given Curtis a cigarette if he had known Curtis's age.

[8] We would also note that Curtis's mother, who Curtis complains was not present for his interrogation, stated at Curtis's first hearing that she would not "waste" money getting Curtis a lawyer "on something that's true," so it isn't clear that having his mother present would have changed Curtis's mind on whether he wanted to speak to police. (Sept. 29, 2014, Tr. at 16). In fact, at one point in Curtis's initial hearing Curtis stated he wanted to "plead guilty to this [sic] whole charges," but the juvenile court said it would not accept the admission because the "whole bindover question" had to be resolved, so a denial to the charges was entered. (*Id*. at 15).

{¶67} All of Curtis's arguments in his fifth, sixth, and seventh assignments of error contend that he should be treated as a juvenile/child even though his case was transferred to the general division of the common pleas court and he faced adult penalties. However, Curtis contends that additional protections should apply to juveniles even if they are being tried in criminal court similar to prohibiting the death penalty for crimes committed as juveniles as in *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183 (2005), and prohibiting a life-without-parole sentence on a juvenile offender who did not commit a homicide as in *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011 (2010).

{¶68} Curtis also directs us to *In re C.P.*, 131 Ohio St.3d 513, 2012-Ohio-1446, wherein the Supreme Court of Ohio determined that lifetime sex offender registration is unconstitutional for juveniles who "*remain in the juvenile system.*" (Emphasis added). *C.P.* at ¶ 84. Similarly, Curtis relies heavily on a case from the Supreme Court of Pennsylvania wherein it was determined that Pennsylvania's lifetime sex-offender registration provision *as applied to juveniles in juvenile court* was unconstitutional. *In re J.B.*, 107 A.3d 1, 20 (Pa.2014).

{¶69} As *C.P.* and *J.B.* addressed juveniles in juvenile court, not juveniles whose cases were transferred to criminal court facing adult penalties, they are facially distinguishable from the case *sub judice*.

{¶70} The arguments raised by Curtis have actually been presented to, and rejected by, multiple Ohio Appellate Courts. In *State v. Martin*, 8th Dist. Cuyahoga No. 102783, 2016-Ohio-922, the Eighth District Court of Appeals recently considered nearly identical claims to those posed by Curtis in a case wherein a juvenile's case had been transferred to criminal court. The Eighth District found Martin's arguments that a mandatory lifetime classification was unconstitutional invalid, reasoning, "The flaw in Martin's argument is that he is trying to equate a death sentence or a life sentence without the possibility of parole with having to register as a sex offender for life. It is illogical to do so and, as such, we decline to extend the reasoning * * * to the facts present here." *State v. Martin*, 8th Dist. Cuyahoga No. 102783, 2016-Ohio-922, ¶ 21, *appeal not allowed*, 146 Ohio St.3d 1471, 2016-Ohio-5108.

{¶71} In *State v. Reidenbach*, 5th Dist. Coshocton No. 2014CA0019, 2015-Ohio-2915, the Fifth District addressed arguments similar to Curtis's—and similar to those argued in *Martin*—and concluded the same as the Eighth District Court of Appeals, holding,

> **As Justice Pfeifer definitively stated, the *C.P.* case applied to juveniles deemed juvenile offender registrants who remained in the juvenile system. Such is not the case sub judice. In this case, appellant was bound over to adult court pursuant to R.C. 2152.10(B) and 2152.12, a discretionary procedure by the juvenile court. The juvenile court provided appellant with due process, holding a probable cause hearing and amenability hearings before making its determination. * * * Once the bind over**

**occurred, appellant was no longer a "child" pursuant to R.C. 2152.02(C)(4).**

*Reidenbach* at ¶ 33, *motion for delayed appeal granted*, 143 Ohio St.3d 1497, 2015-Ohio-4468, ¶ 33, and *appeal not allowed*, 144 Ohio St.3d 1476, 2016-Ohio-467, ¶ 33.

**{¶72}** We wish to emphasize that the Supreme Court of Ohio declined jurisdiction in both *Martin* and *Reidenbach*. Combining this fact with the Supreme Court of Ohio's emphasis in *C.P.*, *supra*, that its holding was limited to juveniles in juvenile court, we do not find Curtis's arguments persuasive here. Therefore, we agree with the Eighth and Fifth District Courts of Appeal and find that a lifetime sex offender registration does not violate due process rights, or constitute cruel and unusual punishment, where a juvenile's case has been transferred to criminal court. Therefore, Curtis's fifth and sixth assignments of error are overruled. As we find no error in Curtis's Tier III sex offender classification in this case, we cannot find that Curtis's trial counsel was ineffective for failing to object to that classification, therefore his seventh assignment of error is also overruled.

*Third Assignment of Error*

**{¶73}** In Curtis's third assignment of error, he argues that his convictions for Aggravated Burglary and Robbery should have merged for the purposes of sentencing. Specifically, Curtis contends that the harm from the Robbery was not a

separate and identifiable harm from the harm caused by the aggravating element of the Aggravated Burglary, and that the crimes were committed with the same animus.

**{¶74}** Whether offenses are allied offenses of similar import is a question of law that this Court reviews *de novo. State v. Badertscher*, 3d Dist. Putnam No. 12-14-06, 2015-Ohio-927, ¶ 21, citing *State v. Stall,* 3d Dist. Crawford No. 3–10–12, 2011–Ohio–5733, ¶ 15, citing *State v. Brown,* 3d Dist. Allen No. 1–10–31, 2011–Ohio–1461, ¶ 36. Revised Code 2941.25, Ohio's multiple-count statute, states:

> **(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**
>
> **(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

**{¶75}** In *State v. Ruff,* 143 Ohio St.3d 114, 2015–Ohio–995, the Supreme Court of Ohio provided Ohio courts with the following guidelines as to how to interpret R.C. 2941.25.

> **As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?** ***An affirmative answer to any of the above will***

> *permit separate convictions*. **The conduct, the animus, and the import must all be considered.**

(Emphasis added.) *Ruff* at ¶ 31.[9] The Court further held in *Ruff* that "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id*. at ¶ 26.

{¶76} In this case Curtis argues that his convictions for Aggravated Burglary and Robbery were allied offenses of similar import. As indicted in this case, these statutes read as follows.

**Aggravated Burglary – R.C. 2911.11(A)(1)**

**(A)  No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:**

**(1)  The offender inflicts, or attempts or threatens to inflict physical harm on another;**

**Robbery – R.C. 2911.02(A)(2)**

**(A)  No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:**

---

[9] *Ruff*, a 6-1 decision (with two justices concurring in judgment only), clarified the Supreme Court of Ohio's plurality opinion in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314. *Johnson* removed the element-comparison test that had been used under *State v. Rance*, 85 Ohio St.3d 632 (1999), and replaced it with an analysis that required courts to look at a defendant's conduct. *Ruff* provided more concrete guidelines for courts to use in determining whether the "conduct" referenced in *Johnson* constituted allied offenses.

* * *

**(2)   Inflict, attempt to inflict, or threaten to inflict physical harm
on another[.]**

{¶77} On appeal, Curtis argues that both the Aggravated Burglary and the Robbery allege that Curtis inflicted, attempted, or threatened to inflict physical harm on I.S.  He argues that the physical harm from the Robbery was the same physical harm that elevated the Burglary to Aggravated Burglary.  Curtis argues that the animus that "drove" Curtis when he "rifled through [the victim's] purse in the kitchen" was the same as the animus Curtis had during his struggle with the victim in her office.  (Appt.'s Br. At 19).

{¶78} Contrary to Curtis's arguments, his actions reflect separate periods of harm separated by time and action, and a separate animus for his actions.  Any of these points could lead a trial court to find that the offenses did not merge.

{¶79} The evidence showed that Curtis initially entered I.S.'s residence when she was not home and began taking her jewelry.  When I.S. returned home, Curtis remained in the home, and he attacked her when she saw Curtis hiding in her office closet.  Curtis then struck I.S. multiple times while in the office and told her to take him to the back door of the residence so he could leave.

{¶80} This physical violence during a trespass was separate from what then took place as Curtis pushed I.S. down the hallway into the bedroom and raped her.

Curtis also struck I.S. multiple times in the bedroom in the face and neck and restrained her, all leaving bruises. After the sexual assault, I.S. mentioned that she had money in her purse. Curtis then physically dragged her to the kitchen by her neck and took the money in her purse.

{¶81} It seems clear that Curtis initially striking and threatening the victim was to facilitate an escape from the Burglary, then the separate commission of a Rape, and thereafter separately dragging the victim to the kitchen to facilitate a Robbery, demonstrating a separate animus in each instance. Thus there were separate spaces of time and separate scenes of violence, each with separate motivation and animus, in the office, the bedroom, the kitchen, and arguably the hallway as well. That such spaces of time and scene existed illustrates that Curtis's convictions were not committed by the same conduct.[10] Similar conduct over a short span of time does not make the conduct the same.

{¶82} Thus for any and all of these reasons we find that the trial court did not err in sentencing Curtis on both the Aggravated Burglary conviction and the Robbery conviction. Therefore, Curtis's third assignment of error is overruled.

*Fourth Assignment of Error*

{¶83} In Curtis's fourth assignment of error, he argues that the trial court erred when it failed to calculate and include in its sentencing entry the number of

---

[10] As noted earlier, the Kidnapping was merged for the purposes of sentencing with the Rape conviction.

days of jail-time credit Curtis was entitled to under R.C. 2967.191. Specifically, Curtis argues that the trial court did not credit him with the proper amount of time that Curtis spent in a juvenile facility awaiting trial.

**{¶84}** Jail-time credit is prescribed by R.C. 2967.191, which authorizes a trial court to give a defendant credit for the total number of days that he was "confined for any reason arising out of the offense for which he was convicted and sentenced," which includes, "confinement in a juvenile facility." An offender may challenge the amount of jail-time credit on direct appeal. *See, e.g., State v. Phillips*, 7th Dist. Mahoning No. 16 MA 0003, 2016-Ohio-5194. A trial court commits plain error when it fails to include the appropriate amount of jail-time credit in the sentencing entry. *State v. Washington*, 1st Dist. Hamilton No. C-140315, 2015-Ohio-1815, ¶ 9, citing *State v. Hargrove,* 1st Dist. Hamilton No. C–120321, 2013–Ohi0–1860, ¶ 9.

**{¶85}** In this case the State actually agrees with Curtis that he was not given the proper amount of jail-time credit, stating that Curtis was not credited for his confinement in a juvenile facility pending trial. However, the State argues that after Curtis's notice of appeal had been filed in this case, Curtis filed a pro se motion seeking proper jail-time credit, and that motion was granted. The State thus contends that any error has been remedied. In the alternative, the State concedes in its brief that if we determine that because an appeal was already pending, the trial

court did not have jurisdiction to correct the jail-time credit in this instance, the case should be remanded for the trial court to authorize the proper amount of credit.

**{¶86}** At the outset we note that Curtis and the State are correct that Curtis was not awarded proper jail-time credit at sentencing. At the sentencing hearing, the State argued that Curtis was not entitled to credit for time spent confined in a juvenile facility awaiting trial, despite the clear language to the contrary in R.C. 2967.191. Thus we agree that the initial calculation not containing days of confinement in a juvenile facility was indeed inaccurate.

**{¶87}** Now, we must determine whether the trial court had jurisdiction to correct its jail-time credit calculation after a notice of appeal had already been filed in this Court. The Supreme Court of Ohio has stated,

> **The general rule of law is that the trial court loses jurisdiction to take action in a cause after an appeal has been taken and decided. * * * See, also, 7 Moore's Federal Practice (2 Ed.) 419, Paragraph 60.30(2), wherein it is stated:**
>
> **"But, the general rule is that when an appeal is taken from the district court the latter court is divested of jurisdiction, except to take action in aid of the appeal, until the case is remanded to it by the appellate court."**
>
> **Yet, it has been stated that the trial court does retain jurisdiction over issues not inconsistent with that of the appellate court to review, affirm, modify or reverse the appealed judgment, such as the collateral issues like contempt, appointment of a receiver and injunction.**

*State ex rel. Special Prosecutors v. Judges, Court of Common Pleas*, 55 Ohio St.2d 94, 97 (1978).

{¶88} Ohio Appellate Courts have, arguably, differed on whether a trial court has jurisdiction to correct jail-time credit while a case is pending on appeal. In *State v. Washington*, 1st Dist. Hamilton No. C-140315, 2015-Ohio-1815, the First District Court of appeals determined that a trial court had continuing jurisdiction to correct jail-time credit following sentencing; however, "once a notice of appeal has been filed in a case, a trial court 'loses jurisdiction to act, except to take action in aid of the appeal or in a manner not inconsistent with the appeals court's jurisdiction to review, affirm, modify, or reverse the appealed judgment.' " *Washington* at ¶ 6, citing *State v. Morgan,* 1st Dist. Hamilton No. C–140416, 2014–Ohio–5325, ¶ 12, citing *State ex rel. Prosecutors v. Judges,* 55 Ohio St.2d 94, 97 (1978).

{¶89} Meanwhile, in *State v. Sturgell*, 9th Dist. Summit No. 26618, 2013-Ohio-3518, the Ninth District seemed to imply that a trial court could correct jail-time credit while the case was pending appeal, however, credit was not specifically at issue on appeal in that decision.[11] *See Sturgell* at ¶¶ 4-5.

{¶90} In our own review of the issue, we note that jail-time credit is an issue that may be appealed by an appellant to an appellate court. Therefore, by correcting jail-time credit after a notice of appeal has been filed, the trial court is exercising

---

[11] *Sturgell* also involved a delayed appeal, further distinguishing it from this case.

jurisdiction over an issue that is potentially inconsistent with the appellate court's jurisdiction. Because of this, we find that the First District Court of Appeals decision in *Washington* determining that a trial court lacks jurisdiction to correct jail-time credit after a notice of appeal has been filed, contains the better rule. Accordingly, Curtis's fourth assignment of error is sustained to the extent that this matter must be reversed and remanded to the trial court to issue an entry containing proper jail-time credit with the proper jurisdiction to do so.

{¶91} For the foregoing reasons, Curtis's first, second, third, fifth, sixth, and seventh assignments of error are overruled. Curtis's fourth assignment of error is sustained, and this case is remanded to the trial court for the limited purposes of exercising its jurisdiction to correct Curtis's jail-time credit.

***Judgment Affirmed in Part, Reversed in Part and Cause Remanded***

**PRESTON and ROGERS, J.J., concur.**