[Cite as *State v. Lewis*, 2017-Ohio-167.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 27887 |
| | |
| Appellee | |
| | |
| v. | APPEAL FROM JUDGMENT |
| | ENTERED IN THE |
| RAMOUS DAMON LEWIS | COURT OF COMMON PLEAS |
| | COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 2013 09 2503(D) |

DECISION AND JOURNAL ENTRY

Dated: January 18, 2017

MOORE, Judge.

{¶1} Defendant, Ramous Lewis, appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} In 2013, Branson Price and Paris Wicks were shot while at a drive-thru convenience mart in Akron, Ohio. Mr. Wicks died from his injuries. Complaints were filed in the Summit County Juvenile Court alleging Mr. Lewis to be a delinquent child based upon his alleged involvement in this purportedly gang-related assault, robbery, and murder. Mr. Lewis waived his right to a probable cause hearing in the juvenile court, and the case proceeded to an amenability hearing on the State's motion for the juvenile court to relinquish jurisdiction. The juvenile court found that Mr. Lewis was not amenable to rehabilitation in the juvenile justice system, and the court transferred the case to the general division of the Summit County Court of

Common Pleas ("the trial court"). Mr. Lewis was indicted on several charges in the trial court, to which he initially pleaded not guilty.

{¶3} The case proceeded to trial. During the course of the trial, Mr. Lewis changed his plea to guilty on one charge of aggravated murder together with attendant gun and gang specifications, one charge of felonious assault, and one charge of having a weapon under disability. The trial court then dismissed the remaining charges and specifications upon the request of the prosecutor. In a journal entry dated April 15, 2015, the trial court imposed an aggregate sentence of thirty years to life imprisonment.

{¶4} Mr. Lewis requested a delayed appeal from the sentencing entry, which this Court granted. He now presents one assignment of error for our review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT TRANSFERRED
15-YEAR-OLD RAMOUS LEWIS'[] CASE FOR CRIMINAL PROSECUTION
IN VIOLATION OF R.C[.] 2152.12(B)[.]

{¶5} In his sole assignment of error, Mr. Lewis contends that the juvenile court abused its discretion in transferring his case to the trial court because he was amenable to treatment in the juvenile justice system. We disagree.

{¶6} We first note that Mr. Lewis pleaded guilty after his transfer to the trial court. The Ohio Supreme Court has held that "a defendant who * * * voluntarily, knowingly, and intelligently enters a guilty plea with the assistance of counsel 'may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.'" *State v. Smith*, 9th Dist. Summit No. 26804, 2015-Ohio-579, ¶ 25, quoting *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, ¶ 78, quoting *Tollett v.*

*Henderson*, 411 U.S. 258, 267 (1973). "This Court has explained that '[a] defendant who enters a plea of guilty waives the right to appeal all nonjurisdictional issues arising at prior stages of the proceedings, although [he] may contest the constitutionality of the plea itself.'" *Smith* at ¶ 25, quoting *State v. Quarterman*, 9th Dist. Summit No. 26400, 2013-Ohio-3606, ¶ 4, quoting *State v. Atkinson*, 9th Dist. Medina No. 05CA0079-M, 2006-Ohio-5806, ¶ 21.

{¶7} However, the general division of the common pleas court lacks jurisdiction over a juvenile defendant absent a "proper" bindover proceeding. *See State v. Wilson*, 73 Ohio St.3d 40, 44 (1995) ("[A]bsent a proper bindover procedure pursuant to [former] R.C. 2151.26, the juvenile court has the exclusive subject matter jurisdiction over any case concerning a child who is alleged to be a delinquent."). Because a bindover proceeding pertains to the jurisdiction of the common pleas court, some courts have held that challenges to juvenile court's decision with respect to the R.C. 2152.12 factors pertaining to bindover are not waived through a guilty plea. *State v. Amos*, 1st Dist. Hamilton No. C-150265, 2016-Ohio-1319, ¶ 28-29; *see also State v. Legg*, 4th Dist. Pickaway No. 14CA23, 2016-Ohio-801, ¶ 31, fn. 3, and *State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, ¶ 40, fn. 2, citing *State v. Douglas,* 20 Ohio St.3d 34, 35 (1985) (juvenile who was transferred to adult court, pled guilty to charges, and was subsequently convicted, appealed convictions alleging that the bindover proceeding was not proper). Further, this Court has recently addressed the challenges to the juvenile court's ruling with respect to a bindover where a juvenile defendant ultimately pleaded guilty to the charges in adult court, and we will likewise proceed to review the propriety of the bindover in this case. *See State v. Vaughn*, 9th Dist. Summit No. 27902, 2016-Ohio-7384, ¶ 5-17.

{¶8} "[A] juvenile court's determination regarding a child's amenability to rehabilitation in the juvenile system is reviewed by an appellate court under an abuse-of-

discretion standard." *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, ¶ 14. An abuse of discretion connotes that the court was unreasonable, arbitrary, or unconscionable in its decision. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶9} Two types of transfer exist under R.C. 2152.10 and 2152.12. *D.W.* at ¶ 10, quoting *State v. Hanning*, 89 Ohio St.3d 86, 90 (2000). "Mandatory transfer removes discretion from judges in the transfer decision in certain situations[,]" which do not apply here. *See D.W.* at ¶ 10, quoting *Hanning* at 90; R.C. 2152.12(A). The Ohio Supreme Court has recently decided that the mandatory transfer of juveniles is unconstitutional. *State v. Aalim,* Slip Opinion No. 2016-Ohio-8278, ¶ 28. "Discretionary transfer, as its name implies, allows judges the discretion to transfer or bind over to adult court certain juveniles who do not appear to be amenable to care or rehabilitation within the juvenile system or appear to be a threat to public safety." *D.W.* at ¶ 10, quoting *Hanning* at 90; R.C. 2152.12(B). *See Aalim* at ¶ 29 (holding that the unconstitutional provisions mandating transfer in R.C. 2152.10 and 2152.12 are severable from the constitutional provisions related to discretionary transfer).

> In instances of discretionary transfer, as in this case, "the juvenile court is * * * to determine the age of the child and whether probable cause exists to believe that the juvenile committed the act charged. R.C. 2152.10(B) and 2152.12(B)(1) and (2). However, if probable cause exists and the child is eligible by age, the juvenile court must then continue the proceeding for a full investigation. R.C. 2152.12(C) and Juv.R. 30(C). This investigation includes a mental examination of the child, a hearing to determine whether the child is 'amenable to care or rehabilitation within the juvenile system' or whether 'the safety of the community may require that the child be subject to adult sanctions,' and the consideration of 17 other statutory criteria to determine whether a transfer is appropriate. Juv.R. 30(C); R.C. 2152.12(B), (C), (D), and (E)."

*D.W.* at ¶ 11, quoting *In re M.P.* at ¶ 12.

**{¶10}** When determining whether to transfer a child to the trial court for adult prosecution, R.C. 2152.12(D) requires that a juvenile court consider any relevant factors, including the following factors, in favor of transfer:

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

**{¶11}** Former R.C. 2152.12(E) required that the juvenile court consider any relevant factor against a transfer, including the following:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or is a mentally retarded person.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

{¶12} Here, at the amenability hearing, Dr. Thomas Webb testified as a court witness. Dr. Webb testified that he was the juvenile court psychologist, and he completed a psychological consult and amenability evaluation with regard to Mr. Lewis. The report was marked as a court exhibit and entered into evidence. With respect to Mr. Lewis' background, Dr. Webb indicated that Mr. Lewis had experienced instability with respect to his parenting and housing. He had little relationship with his father, and his mother moved frequently between Akron and Cleveland, experiencing incidents of homelessness. Mr. Lewis' mother had become involved with a person who had been violent toward her. Dr. Webb explained that witnessing this violence could have caused Mr. Lewis to have less strictures in thinking about the impact of violence, and it could raise the probability of him thinking about violence as an option in dealing with situations.

{¶13} In addition, Dr. Webb indicated that Mr. Lewis was close to his grandfather, who had passed away, at which point Mr. Lewis became very depressed, began having hallucinations, and became suicidal. His mother took him to a hospital, where he was prescribed medication for psychosis. During the course of his detention on the current charges, Dr. Webb stated that Mr. Lewis had begun to have a better understanding of his need to take his medicines.

**{¶14}** Dr. Webb opined that Mr. Lewis also has a mild intellectual disability. The doctor concluded that Mr. Lewis' lower cognitive processing capabilities contributed to an emotional immaturity for his age and a decreased ability to anticipate events and make appropriate judgments. Dr. Webb acknowledged that Mr. Lewis had behavioral issues previous to the present incident which had brought him into the juvenile court system. Although there had been several attempts to assist Mr. Lewis through therapeutic measures, Dr. Webb acknowledged that the severity of Mr. Lewis' criminal behavior had increased over time. Dr. Webb stated that Mr. Lewis could not read, but he was very sensitive to the opinions of others with respect to his intelligence, and even slight criticism directed toward him affected him. Dr. Webb indicated that he believed Mr. Lewis could be swayed by his peers because he wanted to fit in and be respected, this being a major issue for him. Dr. Webb indicated that, sometimes for children with limited comprehension, it takes a very concrete experience to jerk them into reality, which Dr. Webb believed to have happened here.

**{¶15}** Dr. Webb concluded that he believed there had been a change in Mr. Lewis while in detention related to this incident, as he had benefitted from the structure that had been imposed, the supervision of his psychotropic medication, and the day-to-day access to emotional support from a drug counselor and a social worker.

**{¶16}** The State then presented its witnesses, including Branson Price, Christopher Smith, Sergeant Anthony Starvaggi, and Detective Rodd Criss. Mr. Price testified that he was 23 years old. On August 29, 2013, Mr. Price and his close friend, Mr. Wicks, decided to go to the mall. Mr. Price picked up Mr. Wicks, and Mr. Wicks handed a gun to Mr. Price because Mr. Price had a permit to carry concealed weapons. Mr. Wicks wanted to stop to get a t-shirt at the drive-thru on Lovers Lane and Arlington Road in Akron, Ohio. Mr. Price pulled into the parking

lot, and Mr. Wicks went inside. While Mr. Wicks was inside, a couple of men started talking to Mr. Price through the passenger window. Mr. Price had Mr. Wicks' gun on his lap at that time, because he believed the area to be unsafe. When Mr. Price turned his head, he saw Mr. Lewis at his driver's side window with a gun. Mr. Lewis reached through the window, took Mr. Price's gun off of his lap, and pointed both guns toward him. He told Mr. Price to give him everything he had or he would kill him. Mr. Price opened his car door, put his hands up, and tried to calm Mr. Lewis down by telling him that he did not have to do this. When Mr. Wicks came out of the drive-thru, Mr. Lewis turned his attention on him for a moment, and Mr. Price tried to grab Mr. Lewis' gun. Mr. Price missed the gun, and Mr. Lewis fired a shot at him that missed him. Mr. Price then was able to grab the barrel of Mr. Lewis' gun, and Mr. Lewis shot Mr. Price in the leg. Mr. Price ran to the back of the drive-thru and could see people in a scuffle with Mr. Wicks. Mr. Price then ran to a mechanic's shop, where he recalled speaking to police while he was in and out of consciousness. After he was taken to the hospital, Mr. Price learned that Mr. Wicks had died.

{¶17} Mr. Price testified that the shooting had changed his life. Although he had physically recovered, his state of mind had prevented him from finishing college and maintaining his previous full time employment. He had nightmares and thought about the incident every day. He tried to imagine different ways that he could have handled the situation, and it "haunt[ed]" him. He witnessed Mr. Wick's mother's pain, and he had not seen his own mother in six months because she lived down the street from the drive-thru, and he was concerned about returning to the area.

{¶18} Mr. Smith testified that he is an intensive probation officer at the Summit County Juvenile Court. Mr. Lewis was originally placed on traditional probation with him in January

2011 as a result of a misdemeanor assault case. Mr. Smith stated that Mr. Lewis was likable, but he had some behavioral issues, especially in school because he became easily frustrated. Mr. Lewis would do well going to school for periods of time and then have long periods of absenteeism. Mr. Smith believed that Mr. Lewis received ineffective supervision at home, and he had issues with curfew and rule compliance while on probation. In July 2011, Mr. Lewis received felony firearm and receiving stolen property charges. In July 2012, Mr. Lewis received a second degree burglary charge and was placed on intensive probation at that time. Mr. Lewis previously attended a program at the Youth Outreach Center, and he participated in counseling at the Village Network Program. Mr. Lewis would start out compliant with counseling, but his compliance would then taper off, and he would become noncompliant. He did not participate as required at Sylvan Learning because he was not at the place he was supposed to be for pickup. Mr. Lewis had some history of marijuana use, but he was able to get clean and stay clean for extended periods of time. Mr. Lewis came very close on two occasions to completing his probation, but each time he had picked up a new charge at the very end of the probation period. Mr. Lewis was not on probation or any type of supervision at the time of the instant offense.

{¶19} Sergeant Starvaggi of the Akron Police Department testified that he was one of the officers that responded to the scene of the shootings. The sergeant confirmed that four individuals were charged as a result of the shootings, and Mr. Lewis was the only one of those four individuals who was a juvenile. The other suspects were in their late teens or early twenties. Detective Criss, of the Akron Police Department's Gang Unit, testified that he recognized the monikers of the other individuals purportedly involved in the shootings, because those individual belonged to the KaiKa Klan Outlaw Gang, which had a known criminal presence in the area of the shootings. The investigation of the shootings had also revealed that an individual known by

the moniker of Doobie might have been involved in the incident. In order to try to identify Doobie, the detective reviewed rap videos that the KaiKa Klan Outlaw Gang had posted on YouTube. The detective located some new videos, which involved the three suspects with whom he was familiar, and then the detective came across a video that included Mr. Lewis with the three suspects. The State introduced a still shot photograph from one of these videos and a photograph from Mr. Lewis' Facebook page that displayed Mr. Lewis wearing a gun on a lanyard around his neck. The detective maintained that wearing guns from lanyards in this fashion is distinctive of the KaiKa Klan Outlaw Gang. In another photograph, the detective indicated that Mr. Lewis was "throwing up" the KaiKa Klan Outlaw Gang hand sign.

{¶20} The defense did not put on witnesses, but in closing argument the defense maintained that there existed several factors in favor of retaining jurisdiction in the juvenile court. The defense argued that, as Mr. Lewis was only 16 ½ years old, there was ample time to rehabilitate him in the juvenile system. The defense pointed to Mr. Lewis' cognitive delays, lack of structure in his life until his detention on the current charges, and the fact that he was prone to suggestibility. The defense also referenced Dr. Webb's testimony that Mr. Lewis was doing well in detention. The defense further pointed out that Mr. Lewis was not on court ordered supervision at the time of the offense. The defense additionally maintained that the evidence demonstrated that Mr. Lewis was not emotionally, physically, or psychologically mature enough for the transfer.

{¶21} In the juvenile court's transfer order, the court concluded that the factors weighing in favor of transfer outweighed those against transfer. On appeal, Mr. Lewis maintains

that the trial court abused its discretion in weighing the factors.[1] At several points in his argument, Mr. Lewis cites to Dr. Webb's evaluation regarding Mr. Lewis' intellectual delay, young age, mental health issues and susceptibility to influence. In Dr. Webb's report, he discussed these issues, and, he opined that the factors did not align with the psychological and developmental factors favoring bindover. However, from the juvenile court's order, it appears that the juvenile court considered the issues raised in the doctor's report, noting that Mr. Lewis' low IQ and his physical, emotional, and psychological immaturity were factors that weighed toward retaining jurisdiction.

{¶22} Further, Mr. Lewis argues that Detective Criss' testimony did not suggest that Mr. Lewis was "entrenched" in a gang. However, the juvenile court did not find that Mr. Lewis was "entrenched" in a gang, and instead referenced in its order that the crimes were alleged to have been part of gang activity. *See* R.C. 2152.12(D)(4).

{¶23} Mr. Lewis also suggests that this case is similar to that in *State v. Thrasher*, 9th Dist. Summit No. 27547, 2015-Ohio-2504, where this Court held that a trial court abused its discretion in failing to adequately consider a defendant's traumatic history in mitigation at sentencing. [2] *Id.* at ¶ 21. In *Thrasher*, the issue pertained to the weight that the trial court gave the seriousness and recidivism sentencing factors contained in R.C. 2929.12. *Id.* at ¶ 7. There,

---

[1] In Mr. Lewis' brief on appeal, he relies on articles available online, although these articles were not before the trial court in making its decision. We cannot discern how the trial court's failure to consider the information or views expressed in publications that were not before it could amount to an abuse of discretion, and, accordingly, we will proceed to review the assignment of error without reference to these articles.

[2] *Thrasher* was decided prior to the Ohio Supreme Court's decision in *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 23, which clarified the standard of review applicable to sentencing.

defense counsel, in arguing against a prison sentence, emphasized Mr. Thrasher's tragic childhood history, which included physical and sexual abuse, abandonment, and drug use. *Id.* at ¶ 16. During sentencing, the trial court characterized Mr. Thrasher's history in such ways that were discordant with the facts before it, and imposed a prison sentence which was two-and-a-half times longer than the prison sentence requested by the State. *Id.* at ¶ 20-21.

{¶24} Here, aside from the fact that the juvenile court was weighing factors relative to amenability as opposed to sentencing, this case is distinguishable from *Thrasher* in that we see no indication that the court below failed to give due weight to the statutory factors. The juvenile court's decision cites to factors both in favor of, and against, transfer, and it concludes that the factors in favor of transfer outweighed those against it.

{¶25} Mr. Lewis further cites the Second District's decision in *State v. D.H.*, 2d Dist. Montgomery No. 26383, 2015-Ohio-3259, where the Second District held the juvenile court's order finding the juvenile to not be amenable to rehabilitation in the juvenile justice system must include sufficient findings so that the reviewing court can "identify how the court reached its conclusion that [the juvenile] could not be rehabilitated in the juvenile system." *Id.* at ¶ 17-18. Mr. Lewis maintains that the trial court did not adequately explain why Mr. Lewis could not be rehabilitated in the juvenile court system, and he maintains that the trial court did not give due consideration and place greater weight on certain factors in favor of retaining jurisdiction. However, here, in the juvenile court's order transferring jurisdiction to the trial court, the juvenile court specified factors for and against transfer, and determined that the factors weighed in favor of transfer. Pursuant to former R.C. 2152.12(E), the juvenile court considered the following factors against transfer: that Mr. Lewis was fifteen years old at the time of the offense, that he had a full scale IQ of 48 and was low functioning, that he had diagnoses of conduct

disorder, intellectual disability, depressive disorder with anxiety, and posttraumatic stress disorder, and that he was not physically, emotionally or psychologically mature enough for transfer. Pursuant to R.C. 2152.12(D), the juvenile court considered the following factors in favor of transfer: two victims were shot with one of the victims dying from a gunshot wound, the acts were alleged to be part of gang activity, Mr. Lewis used a gun in the commission of the offenses and fired it at least three times, Mr. Lewis had prior court involvement, including two prior assault charges, and Mr. Lewis had previously been referred for counseling services through different agencies, had attended a ninety-day behavioral therapy program at the juvenile court, and had been referred for substance abuse counseling. The trial court concluded that rehabilitation could not be achieved in the juvenile system, and that, because of the gravity of the offenses, community safety required Mr. Lewis to be subject to adult sanctions.

{¶26} Although the separate opinion takes issue with the trial court's consideration of the gravity of the offenses in its finding pertaining to community safety, Mr. Lewis raised no challenge to the trial court considering the gravity of the offense in this manner. Nonetheless, we do not read *State v. Watson*, 47 Ohio St.3d 93 (1989) as precluding the trial court from considering the gravity of the offense in addressing the safety of the community. To the contrary, inherent in *Watson* is a presumption that the seriousness of the offense is part of an analysis of the safety of the community, and that both community safety and the seriousness of the offense could be considered in determining a juvenile's amenability to treatment under former Juv.R. 30. *See id.* at 94, 96 (where the appellant challenged the juvenile court's finding that appellant "would not be amenable to the juvenile justice system *for the reason that the safety of the community may require his retention beyond the age of majority*, and that the statute in Ohio requires that the Department of Youth Services relinquish[] its jurisdiction upon the age of

twenty-one * * *[,]" Supreme Court addressed the issue by discussing the relevance of the "*seriousness of the alleged act*" to the amenability determination) (Emphasis added.). Moreover, under the current statutory scheme, as discussed above, a nonexhaustive list of factors in favor of, and militating against transfer, some of which speak to the seriousness of the offense, apply to determine whether a juvenile is amenable to rehabilitation within the juvenile system, *and* to whether the safety of the community may require that the child be subject to adult sanctions. R.C. 2152.12(B)(3), (D); former R.C. 2152.12(E).

{¶27} Based upon our review of the record, we cannot say that the juvenile court was unreasonable in ordering Mr. Lewis to be bound over to the trial court. Accordingly, Mr. Lewis' sole assignment of error is overruled.

### III.

{¶28} Mr. Lewis' assignment of error is overruled. The judgment of the trial court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

CARR, P. J.
CONCURS IN JUDGMENT ONLY.

HENSAL, J.
CONCURRING IN JUDGMENT ONLY.

{¶29} While I agree that the trial court's judgment must be affirmed, I write separately to emphasize the fact that a juvenile's amenability to rehabilitation and the need for community safety are two separate issues under the statute. In this regard, Revised Code Section 2152.12(B)(3) provides that the juvenile court "may transfer the case if the court finds [that] * * * [t]he child is not amenable to care or rehabilitation within the juvenile system, *and* the safety of the community may require that the child be subject to adult sanctions." (Emphasis added.) While the statute reads in the conjunctive, prior case law interpreting the statute often read in the disjunctive. *See State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, ¶ 11, quoting *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, ¶ 12 (stating that a hearing is necessary to "determine whether the child is 'amenable to care or rehabilitation within the juvenile system' *or* whether 'the safety of the community may require that the child be subject to adult sanctions,' and the consideration of 17 other statutory criteria to determine whether a transfer is appropriate.") (Emphasis added.) More recent precedent, however, reads in the conjunctive. *See State v. Aalim*, ___ Ohio St.3d ___, 2016-Ohio-8278, ¶ 27 ("The General Assembly has provided for

discretionary transfer of children aged 14 or older when there is probable cause to believe the child committed the charged act, the child is not amenable to care or rehabilitation within the juvenile system, *and* the safety of the community may require that the child be subject to adult sanctions.") (Emphasis added.) Regardless, it is clear that these are two separate issues.

{¶30} Here, the juvenile court found that "[g]iven the gravity of the offense, community safety requires that the child be subject to adult sanctions." The majority cites this finding, noting that "[t]he trial court concluded that rehabilitation could not be achieved in the juvenile system, and that, because of the gravity of the offenses, community safety required Mr. Lewis to be subject to adult sanctions." The Ohio Supreme Court, however, has held that the gravity of the alleged offense may be considered when determining whether the juvenile is amenable to rehabilitation. *State v. Watson*, 47 Ohio St.3d 93 (1989), paragraph one of the syllabus. Any reliance upon the gravity of the offense (an issue relevant to the juvenile's amenability) in support of its finding regarding the need for community safety raises a concern as to whether the court relied upon one issue as a basis for finding the other. More specifically, it raises a concern as to whether the court considers the need for community safety as a factor in determining whether the juvenile was amenable to rehabilitation, or vice versa. To the extent that the juvenile court's decision or this court's decision can be construed as doing so, I would hold that such a finding is erroneous. Nevertheless, I concur with the majority's holding that the juvenile court gave due weight to the statutory factors and that its decision in favor of bindover did not result in an abuse of discretion.

APPEARANCES:

CHARLYN BOHLAND, Assistant State Public Defender, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.