[Cite as *In re D.M.*, 2017-Ohio-8768.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re D.M.

Court of Appeals Nos. L-16-1237
L-16-1238

Trial Court Nos. DL 15247752
JC 15247753

and

State of Ohio

Court of Appeals No. L-16-1270

     Appellee

Trial Court No. CR0201502070

v.

D.M.

**DECISION AND JUDGMENT**

     Appellant

Decided: December 1, 2017

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Victoria Bader,
Assistant State Public Defender, for appellant.

* * * * *

**MAYLE, J.**

## Background

{¶ 1} This consolidated appeal concerns a juvenile offender, D.M., who was alleged to be delinquent of two counts of aggravated robbery and two counts of felonious assault, each with accompanying firearm specifications. D.M. appeared before the Lucas County Juvenile Court for a probable cause hearing, and the juvenile court determined that it was required to transfer D.M.'s case to adult court pursuant to the mandatory bindover provisions of R.C. 2152.10(A)(2)(b), 2151.12(A)(1)(b)(ii) and 2152.02(BB)(1). The juvenile court transferred the case to the Lucas County Court of Common Pleas, General Division.

{¶ 2} D.M. ultimately pled guilty to two counts of felonious assault, including two gun specifications, and the state dropped all remaining charges. The court accepted the plea and imposed consecutive sentences for an aggregate term of 15 years in prison.

{¶ 3} Approximately 11 weeks later, D.M.'s counsel moved to vacate the judgment entry and return the case to juvenile court for further proceedings. The state objected to vacating the sentence but agreed that the case should be returned to the juvenile division, pursuant to the reverse-bindover procedure in R.C. 2152.121, so that the juvenile court could determine whether D.M. is amenable to care or rehabilitation within the juvenile system. The court stayed the sentence and transferred the case to juvenile court.

2.

{¶ 4} Following a hearing, the juvenile court concluded that D.M. is not amenable to rehabilitation within the juvenile system and that the safety of the community requires that he be subject to adult sanctions. The juvenile court transferred jurisdiction of the case back to the general division, which reimposed the 15-year prison sentence.

{¶ 5} D.M. now appeals (1) the juvenile court's determination that he is not amenable to rehabilitation within the juvenile system, and (2) the adult court's imposition of consecutive sentences.

{¶ 6} For the reasons set forth herein, we affirm the judgments below.

**Facts and Procedural History**

{¶ 7} On the night of May 4, 2015, D.M. engaged in two separate shootings. In all, D.M. shot at three people, using a .380 semi-auto pistol. D.M. struck and seriously injured two of the three, all of whom were unknown to him. D.M.'s apparent motive was to rob them.

{¶ 8} In the first incident, D.M. and a friend approached a man who was just arriving at his home on Western Avenue, in Toledo. D.M. brandished his pistol and shot the man as he was getting out of his car. D.M. fled. The man required emergency surgery to remove a bullet that traveled through his arm and chest.

{¶ 9} A short time later, D.M. and two others approached a 17-year-old male and his girlfriend, who were sitting in a car just outside the boy's home on Maumee Street, in Toledo. D.M. brandished his pistol and fired the gun as the couple tried to drive away. D.M. shot the boy, who required emergency medical treatment, but missed the girlfriend.

3.

{¶ 10} Three days later, on May 7, 2015, Toledo Police Officers on bike patrol were investigating robberies in the area.  Upon seeing the police, D.M. ran and discarded a weapon.  The police apprehended D.M. and recovered the weapon—a loaded 9 mm automatic Taurus, which was a different weapon than the one he had used in the shootings.  Police also found bullets for a third weapon, a .22-caliber gun, in D.M.'s possession.

{¶ 11} The state filed multiple complaints in delinquency against D.M. in the Juvenile Division of the Lucas County Court of Common Pleas.  As to the first incident, the state alleged that D.M. engaged in conduct that would be considered aggravated robbery and felonious assault, if committed by an adult.  Each charge included a firearm specification.  The state proposed the same charges as to the second incident.

{¶ 12} The state moved the juvenile court to relinquish jurisdiction over D.M. and to transfer him to the adult court so that he could be tried as an adult.

{¶ 13} A hearing was held on the matter, attended by D.M., his mother, and D.M.'s counsel.  Through counsel, D.M. stipulated that he was 17 years old and that there was probable cause to believe that he had engaged in the conduct alleged in the complaints.  The juvenile court recognized that it no longer had jurisdiction and transferred the case, pursuant to the mandatory bindover provisions of R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b).

{¶ 14} On July 2, 2015, the Lucas County Grand Jury indicted D.M. on a total of six criminal counts:

4.

- Two counts of aggravated robbery, in violation of R.C. 2911.01(A)(1) (Counts 1 and 3, respectively), both of which included a firearm specification, pursuant to R.C. 2941.145.

- Two counts of felonious assault, in violation of R.C. 2903.11(A)(2) and (D) (Counts 2 and 4 respectively), both of which included a firearm specification, pursuant to R.C. 2941.145.

- One count of carrying a concealed weapon, in violation of R.C. 2923.12(A)(2) and (F) (Count 5); and

- One count of obstructing official business, in violation of R.C. 2921.31(A) (Count 6).

{¶ 15} D.M. pled guilty to both counts of felonious assault (Counts 2 and 4), including the gun specifications attached to each count. In exchange, the state dismissed the remaining charges in the indictment, i.e. Counts 1, 3, 5 and 6. The trial court accepted D.M.'s guilty plea.

{¶ 16} The court sentenced D.M. on November 20, 2016, imposing a six-year prison term as to Count 2, plus a mandatory three-year term as to the gun specification. It imposed a five-year prison term as to Count 4, plus a mandatory one-year term as to the gun specification. The court ordered that the terms be served consecutively, for a total prison sentence of 15 years.

{¶ 17} The court then ordered D.M. conveyed to the custody of the Ohio Department of Rehabilitation and Corrections.

5.

{¶ 18} On February 1, 2016, the Office of the Public Defender entered a limited appearance of counsel to represent D.M. It argued that the sentencing court should have, pursuant to the reverse-bindover provision of R.C. 2152.121(B)(3), stayed the sentence and returned the case to the juvenile division. That is because, had D.M. been charged with only those offenses for which convictions were obtained—i.e., the felonious assault charges—the juvenile court would have been required to conduct an amenability hearing at the outset of the case before transferring D.M.'s case to the general division. That did not occur because D.M. was initially charged with additional offenses—i.e., the aggravated robbery charges—that required mandatory bindover of his case to adult court.

{¶ 19} The state agreed that D.M.'s case required a reverse-bindover to juvenile court. On March 22, 2016, the trial court stayed execution of D.M.'s prison sentence, transferred D.M.'s case back to juvenile court, and ordered that D.M. be immediately transferred from the state institution to the Lucas County jail to await a juvenile court hearing.

{¶ 20} Following the reverse-bindover, the juvenile court ordered an investigation, including that D.M. be evaluated for purposes of assessing his amenability to rehabilitation within the juvenile system. Thomas Sherman, M.D., a psychiatrist, evaluated D.M. on behalf of the state. D.M. was also evaluated by an expert of his own choosing, Daniel Davis, a psychologist.

6.

{¶ 21} Drs. Sherman and Davis have extensive experience in evaluating juveniles for the purpose of amenability. Both doctors met, individually, with D.M. for about two hours, and both testified at D.M.'s hearing.

{¶ 22} The experts agreed on several points. For example, both noted that D.M. has "positive" relationships with his parents and no history of abuse or neglect. They also agreed that D.M. does not suffer from any mental illness, although he does have attention deficit disorder, which both doctors found insignificant.

{¶ 23} As to the ultimate issue, i.e., whether D.M. was amenable to treatment in the juvenile system, Dr. Sherman testified that the "nature of the offense swayed" him. He said that he would have been inclined to "give him a chance" within the juvenile system because D.M. had no history of committing other felonies, but he was "very troubled" by D.M.'s back-to-back acts of "predatory" violence. Dr. Sherman found it significant that D.M. "kept shooting" at one of the victims even as he drove away. Dr. Sherman also described D.M. as "very matter of fact" in his description of the events, and he believed that D.M. lacked any empathy for the victims. As he testified, "if [he] had remorse, why didn't [he] stop after the first one? Why did [he] get a second gun? Why [was he] out prowling around three nights later?"

{¶ 24} D.M.'s expert witness, Dr. Davis, was also troubled by "two separate and sequential acts of severe violence." He concluded that D.M. "falls squarely in the middle" with regard to his risk of re-offending. On the other hand, he found that D.M. has a moderate-to-high probability of responding successfully in the juvenile justice

7.

system. Dr. Davis said that the ultimate issue—whether D.M.'s actions warranted adult confinement—was a legal issue and not one that he, as a psychologist, could answer.

{¶ 25} In addition to the expert witnesses, the detective who questioned D.M. after his arrest testified at the hearing, as did four witnesses who testified on D.M.'s behalf. They included: a juvenile detention officer, who described D.M. as a "model citizen"; a close friend of D.M.'s who has been a positive influence on D.M. and who spoke of his desire to make positive changes in his life; a teacher with the Toledo Public Schools, who helped D.M. obtain a high school diploma and who characterized his classroom behavior as "excellent"; and the bureau chief for the Ohio Department of Youth Services, who described the services that would be available to D.M. if he remained in the juvenile system, including educational programming, mental health and substance abuse counseling, and job training.

{¶ 26} Following the hearing, the juvenile court concluded that D.M. was not amenable to care or rehabilitation within the juvenile system and that the safety of the community required that he be subject to adult sanctions.

{¶ 27} By judgment entry journalized on September 22, 2016, the juvenile court transferred the case back to the trial court. On October 12, 2016, the trial court "affirmed and enforced" its previous 15-year sentence. It is from these two judgment entries that D.M. appeals.

8.

{¶ 28} D.M. asserts two assignments of error for our review.

1.  The juvenile court abused its discretion and violated D.M.'s right to due process of law when it determined that he was not amenable to treatment in the juvenile system, in violation of R.C. 2152.12(B); Fifth and Fourteenth Amendments to the U.S. Constitution, and Article I, Sections 10 and 16, Ohio Constitution.

2.  The trial court's findings for imposing consecutive sentences were not clearly supported by the record, and as a result the trial court abused its discretion and violated D.M.'s right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

## Bindover and Reverse-Bindover Procedure

{¶ 29} R.C. 2151.23(A) grants juvenile courts with exclusive jurisdiction over children who are alleged to have engaged in conduct that would constitute a crime if committed by an adult.

{¶ 30} R.C. 2152.12, however, creates a "narrow exception to the general rule that juvenile courts have exclusive subject matter jurisdiction over any case involving a child." *State v. Wilson*, 73 Ohio St.3d 40, 42, 652 N.E.2d 196 (1995).  Under R.C. 2152.12, a juvenile court *must* transfer an offender to adult court for criminal prosecution if the "mandatory" transfer provisions apply, and *may* transfer an offender to adult court if the "discretionary" transfer provisions apply.

9.

**{¶ 31}** Mandatory transfers are "special measures for extraordinary cases, involving older or violent [juvenile] offenders." *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, ___ N.E.3d ___, ¶ 36 ("*Aalim II*"), citing *State v. Hanning*, 89 Ohio St.3d 86, 89, 728 N.E.2d 1059. "A juvenile who has committed a qualifying offense and who meets certain age requirements is automatically removed from the jurisdiction of the juvenile division and transferred to the adult court." *Id.* at ¶ 2.[1] The mandatory transfer statutes are set forth in R.C. 2152.10(A) and 2152.12(A).

**{¶ 32}** If a child is not subject to mandatory transfer, the child may be eligible for discretionary transfer to the appropriate court for criminal prosecution if the child is charged with an act that would be a felony if committed by an adult and the juvenile court determines at a hearing that all of the following apply: (1) the child was fourteen years of age or older at the time of the act charged; (2) there is probable cause to believe that the child committed the act charged, and (3) the court determines that the child is not

---

[1] Recently, the Supreme Court of Ohio reconsidered its conclusion that the mandatory transfer statutes are unconstitutional. That is, in *State v. Aalim*, 150 Ohio St.3d 463, 2016-Ohio-8278, ___ N.E. 3d ___, ¶ 3 ("*Aalim I*"), the court found the process of automatically transferring a juvenile, without a hearing, violated the juvenile's right to due process as guaranteed by Article I, Section 16 of the Ohio Constitution. In *Aalim II,* the court reversed itself, finding that its previous decision "usurped the General Assembly's exclusive constitutional authority to define the jurisdiction of the courts of common pleas by impermissibly allowing a juvenile-division judge discretion to veto the legislature's grant of jurisdiction to the general division of a court of common pleas over this limited class of juvenile offenders." *Id.* at ¶ 3. As stated, D.M. does not challenge his mandatory transfer to adult court, but rather what occurred after the case was returned to the juvenile court.

amenable to care or rehabilitation within the juvenile system and the safety of the community may require the child to be subject to adult sanctions, after considering any relevant factors including but not limited to specific factors that are outlined by the statute.  R.C. 2152.12(B), (D), and (E).  "Generally the greater the culpability of the offense, the less amenable will the juvenile be to rehabilitation."  *State v. Watson*, 47 Ohio St.3d 93, 96, 547 N.E.2d 1181 (1989).

{¶ 33} The statutory factors that *favor* discretionary transfer out of the juvenile system are set forth in R.C. 2151.12(D), which provides:

(D) In considering whether to transfer a child under division (B) of this section, the juvenile court shall consider the following relevant factors, and any other relevant factors, in favor of a transfer under that division:

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

{¶ 34} The statutory factors that that weigh *against* discretionary transfer out of the juvenile system are set forth in R.C. 2151.12(E), which provides:

(E) In considering whether to transfer a child under division (B) of this section, the juvenile court shall consider the following relevant factors, and any other relevant factors, against a transfer under that division:

(1) The victim induced or facilitated the act charged.

12.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

{¶ 35} When weighing these and any other relevant factors, the juvenile court has wide latitude in determining whether it should retain or relinquish jurisdiction over a juvenile, and its decision will not be reversed absent an abuse of discretion. *State v. Ramirez*, 12th Dist. Butler No. CA2010-11-305, 2011-Ohio-6531. An "abuse of discretion" implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Thompson*, 12th Dist. Warren No. CA2015-09-083, 2016-Ohio-

13.

2895, ¶ 8. "As long as the court considers the appropriate statutory factors and there is some rational basis in the record to support the court's findings when applying those factors," a juvenile court's decision to retain or relinquish jurisdiction will be upheld on appeal. *State v. Phillips*, 12th Dist. Clinton No. CA2009-03-001, 2010-Ohio-2711, ¶ 39. *See also State v. Blair*, 5th Dist. Stark No. 2016CA00180, 2017-Ohio-5865, ¶ 30, quoting *State v. West*, 167 Ohio App.3d 598, 2006-Ohio-3518, 856 N.E.2d 285, ¶ 10 (4th Dist.).

{¶ 36} In this case, after the state filed its initial charges in juvenile court, D.M. was mandatorily bound over to adult court because he was 17 years old at the time of the shootings, his counsel stipulated that there was probable cause to believe that he had engaged in the alleged conduct, and he was accused of committing a qualifying offense (aggravated robbery) with a firearm. *See* R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b)(ii) and 2152.02(BB)(1). Accordingly, the juvenile court immediately transferred jurisdiction over D.M.'s case to adult court without considering whether D.M. would be amenable to care or rehabilitation within the juvenile system.

{¶ 37} In the adult court, D.M. pled guilty to the lesser charges of felonious assault and the state dropped all other charges. At that point, R.C. 2152.121(B) required the trial court to determine whether to transfer the case back to the juvenile court after considering "what the juvenile court *would have been required to do with the case* if the juvenile had been charged with only those offenses for which convictions were obtained." (Emphasis in original.) *State v. D.B.,* 150 Ohio St.3d 452, 2017-Ohio-6952, 82 N.E.3d 1162, ¶ 12. As the Supreme Court of Ohio recently explained:

14.

In some cases, the trial court must transfer the case back to the juvenile court for disposition. For example, the trial court is required to transfer a case back to the juvenile court if the crimes for which convictions were obtained, had they been delinquency charges, were not subject to transfer to the general division of the court of common pleas. R.C. 2151.121(B)(2). In other cases, the trial court must conduct the reverse-bindover procedure in R.C. 2151.121(B)(3). This procedure is required if the crimes for which convictions were obtained, had they been delinquency charges, would have subjected the juvenile's case only to discretionary, rather than mandatory, transfer proceedings.

*Id.* at ¶ 13.

{¶ 38} Given that D.M.'s case would have been subjected to discretionary, rather than mandatory, transfer proceedings if D.M. had been charged with only those offenses for which convictions were obtained—i.e., the felonious assault charges—the trial court was required to impose the sentence it believed appropriate under R.C. 2929, and then stay that sentence and transfer the case back to the juvenile court for imposition of a serious youthful offender dispositional sentence, unless the state objected. R.C. 2152.121(B)(3).

{¶ 39} Here, that process did not happen right away. After imposing its prison sentence, the court ordered D.M. to the custody of the Ohio Department of Rehabilitation and Corrections. Approximately 11 weeks later, D.M.'s counsel moved to vacate the

15.

conviction and transfer the case to the juvenile court for further proceedings. The state objected to the motion to vacate, but agreed that D.M.'s case required a reverse-bindover to juvenile court. On March 22, 2015, the court ordered D.M.'s sentence stayed and transferred the case to juvenile court.

{¶ 40} At the juvenile court, D.M.'s case proceeded according to R.C. 2152.121(B)(3). The state objected to the imposition of a serious youth offender dispositional sentence, and the court ordered an investigation into the child's history, education, family situations, and any factors bearing on whether the child is amenable to juvenile rehabilitation, including mental examinations of the child. The juvenile court then held an amenability hearing on July 28, 2016. As required, the juvenile court considered the factors of R.C. 2152.12(D) and (E), including whether the factors in favor of transfer to adult court for punishment outweighed the factors that disfavored transfer.

{¶ 41} The juvenile court found the following two factors, which both correspond to Section (E)(5) ("the child previously has not been adjudicated a delinquent child"), weighed against transferring D.M. back to the adult system:

> D.M. had contacts in the Lucas County Juvenile Court between 2011 and 2013 and had completed all court orders; and

> Prior to the instant case, D.M. had never been adjudicated delinquent of a felony offense and has never been placed at a DYS institution.

{¶ 42} The juvenile court determined, however, that those factors were outweighed by the factors of Section (D)(1) ("[t]he victim of the act charged suffered

16.

physical or psychological harm."); Section (D)(5) ("The child had a firearm on or about the child's person or under the child's control at the time of the act charged * * * and the child, during the commission of the act charged, allegedly used or displayed the firearm * * *."); Section (D)(8) ("[T]he child is emotionally, physically, or psychologically mature enough for the transfer."); and Section (D)(9) ("There is not sufficient time to rehabilitate the child within the juvenile system.").  The court specifically noted the following:

> Two victims sustained serious physical injuries as a result of gunshot wounds as a result of the acts charged;

> These acts were separate incidents that occurred approximately 20 minutes apart;

> There was absolutely no provocation by either victim;

> D.M. reached his 18th birthday 2 months and 5 days after commission of the acts charged;

> He was arrested 3 days later with a firearm in his possession which by his admission was not the firearm used in the commission of these acts; and

> While the court found that D.M. may be amenable to rehabilitation, there is not sufficient time to accomplish it in the juvenile justice system, his 21st birthday being in less than 4 years.

**{¶ 43}** The juvenile court concluded that D.M. is not amenable to care or rehabilitation within the juvenile system and the safety of the community requires that D.M. be subject solely to adult sanctions. The juvenile court transferred jurisdiction of D.M.'s case back to the Court of Common Pleas, General Division, for reimposition of the sentence.

## The Juvenile Court's Amenability Determination

**{¶ 44}** In his first assignment of error, D.M. challenges the juvenile court's conclusion that he was not amenable to treatment and that the safety of the community required his transfer. D.M. raises four, multi-tiered arguments. We consider each in turn.

**{¶ 45}** First, D.M. challenges the juvenile court's finding that there was insufficient time to rehabilitate him in the juvenile system, i.e., the Section (D)(9) factor. D.M. characterizes the court's conclusion as arbitrary because, he claims, the record lacks evidence indicating that "treatment and rehabilitation [were] not possible in the juvenile system or would require treatment beyond his 21st birthday."

**{¶ 46}** D.M. relies on a case from the Second Appellate District that found that the court's judgment entry "contain[ed] insufficient factual findings to identify how the court reached its conclusion that [the juvenile] could not be rehabilitated in the juvenile system." *State v. D. H.*, 2d Dist. Montgomery No. 26383, 2015-Ohio-3259, ¶ 17. The Second District remanded the matter back to the juvenile court because the judgment entry did not identify which reports and records the court relied upon; the transcript revealed that no exhibits or documentary evidence were admitted into evidence; the court

18.

did not "identify or discuss what programs are, or are not, available in the juvenile system to satisfy the child's health needs"; the court did not make specific findings about the child's educational deficiencies; and the court did not specifically state "what rehabilitation goals can, or cannot, be accomplished in the juvenile system in a 3-year period." *Id.*

{¶ 47} Since *D.H.*, other appellate districts have commented that, "while we agree that a court needs to genuinely consider the [R.C. 2152.12(D) and (E)] factors, and the record needs to reflect that fact * * * other courts have never gone so far as the Second District in directing the juvenile court's analysis." *State v. Blair*, 5th Dist. Stark No. 2016CA00180, 2017-Ohio-5865, ¶ 39, citing *State v. Reeder*, 10th Dist. Franklin No. 15AP-203, 2016-Ohio-212, ¶ 18; *State v. Marshall*, 1st Dist. Hamilton No. C-150383, 2016-Ohio-3184, ¶ 15; *State v. Rice*, 12th Dist. Butler No. CA2016-01-005, 2016-Ohio-5372, ¶ 18, n. 2. We agree with the reasoning of these courts, and we reiterate that "[a]s long as the court considers the appropriate statutory factors and there is some rational basis in the record to support the court's findings when applying those factors, we cannot conclude that the [juvenile] court abused its discretion in deciding whether to transfer jurisdiction." *Blair* at ¶ 40, quoting *State v. West*, 167 Ohio App.3d 598, 2006-Ohio-3518 (4th Dist.).

{¶ 48} We also find that, unlike *D.H.*, the record provides sufficient detail to allow us to conduct a meaningful review. In addition to the seven witnesses, whose testimony was previously described, the following exhibits were received into evidence: D.M.'s

19.

six-page, handwritten letter to the court in which he apologized and accepted responsibility for his actions, an Ohio Youth Assessment Report indicating that D.M. has a low risk of re-offending, psychological testing results, D.M.'s high school diploma, a victim impact statement, and the police and expert witness reports.

{¶ 49} Also, although a juvenile court is not bound by experts' opinions, the expert evidence in this case supports the court's finding that there was insufficient time to rehabilitate D.M. in the juvenile system. *State v. Smith*, 6th Dist. Wood No. WD-13-057, 2014-Ohio-3855, ¶ 22. Dr. Sherman testified that "there are not resources within the juvenile justice system that could rehabilitate [D.M.] in two years or * * * whatever [time] is left before his twenty-first birthday." And Dr. Davis acknowledged the "inescapable" fact that D.M.'s then-age of 19 weighed against keeping him in the juvenile system.

{¶ 50} We find that the juvenile court "was not required to individually analyze each and every possible avenue for juvenile rehabilitation and decide that [D.M.] was not amenable to them." *State v. Curtis*, 3d Dist. Allen No. 1-15-55, 2016-Ohio-6978, ¶ 50. In its judgment entry, the court specified which Section (D) and (E) factors it found applicable, with reference to the relevant facts of this case. Given the evidence presented at the hearing, combined with the fact that D.M. was just two months shy of turning 18 years old when he committed the serious offenses, it was reasonable for the juvenile court to conclude that D.M. required "more time for rehabilitation than one whose offenses are less serious." *Watson*, 47 Ohio St.3d at 96, 547 N.E.2d 1181 (recognizing how, due to

the age of a juvenile who committed a major felony, there "may not be sufficient time remaining for rehabilitation to take place before the twenty-first birthday"). Consequently, we find a rational basis for the juvenile court's conclusion that there was insufficient time to rehabilitate D.M. in the juvenile system within the three years and approximately two months before his twenty-first birthday.  R.C. 2152.12(D)(9).

{¶ 51} We add that, although D.M. points out that felonious assault with a firearm specification carries a minimum sentence of three years—which, according to D.M., demonstrates that "both rehabilitative and retributive objectives could be accomplished in as little as three years"—that does not mean that those objectives can be accomplished within three years in every single case.  Indeed, the legislature has also recognized that a longer amount of time may be required for rehabilitation given that felonious assault with a firearm specification carries a maximum prison term of up to eight years for the offense and three years for the firearm specification.  Most importantly, in this case, there was evidence—including expert testimony—to support the juvenile court's conclusion that there was insufficient time to rehabilitate D.M. within the juvenile system.

{¶ 52} Second, D.M. argues that the juvenile court's finding that D.M. is mature enough for transfer (the section (D)(8) factor) was "tainted" by his four-month incarceration in adult prison between his sentencing on November 20, 2015, and the court's stay of his sentence and reverse-bindover to juvenile court on March 22, 2016. D.M. argues that R.C. 2152.121 contemplates an immediate reverse-bindover to juvenile court after sentencing and, "[b]ecause D.M.'s amenability determination occurred

21.

following extended exposure and integration into the adult prison system, any factors influenced by this mistake should not have been a part of the juvenile court's amenability determination."

{¶ 53} As his sole support for this argument, D.M. points out that Dr. Sherman stated that D.M. appeared to be mature enough for transfer because he "has done almost a year in the adult system" and had "caught on" well. D.M. argues that this comment somehow caused him to lose "the opportunity to have a meaningful amenability hearing."

{¶ 54} We first note that the majority of D.M.'s approximate "year in the adult system," as recognized by Dr. Sherman, was spent in the county jail rather than prison. He served approximately four months in the county jail before his sentencing on November 17, 2015; he then served approximately four months in adult prison until his reverse-bindover on March 22, 2016; and he was then transferred back to the county jail where he waited approximately six months for the juvenile court's ultimate amenability determination on September 22, 2016.

{¶ 55} D.M. simply does not articulate how, exactly, his four-month stay in adult prison "tainted" the entire amenability proceedings other than to highlight Dr. Sherman's comment. But even if Dr. Sherman's observation regarding D.M.'s year-long acclimation "in the adult system" is set aside, there was additional evidence in the record to support the juvenile court's finding that D.M. is emotionally, physically, and psychologically mature enough for transfer under R.C. 2152.12(D)(8). For example, D.M.'s own expert, Dr. Davis, noted in his report that D.M. tested in the 89th percentile

22.

on the Sophistication Maturity Scale, which is "in the high range," and further noted that "[h]e has good interpersonal skills for his age and can identify non-delinquent, non-violent problem solving alternatives (but, of course, has engaged in behavior that could be considered antisocial and delinquent despite this knowledge.)" Throughout the hearing, multiple witnesses referred to D.M. as a "mature" young man who "interacts" well with others.

{¶ 56} We therefore find that the juvenile court properly included the section (D)(8) factor within its amenability determination because there was a rational basis to support a finding that D.M. is emotionally, physically, and psychologically mature enough for transfer.

{¶ 57} Third, D.M. argues that the juvenile court "conflates amenability to rehabilitation and [the need for] community safety" in making its decision to transfer D.M. back to the general division. D.M. argues that the juvenile court improperly relied upon the seriousness of his offense to support both the amenable to care *and* the safety of the community elements under R.C. 2152.12(B)(3). D.M. argues that one factor (here, the seriousness of the offense) cannot support both elements. In support, D.M. cites a concurring opinion from *State v. Lewis,* 9th Dist. Summit No. 27887, 2017-Ohio-167, ¶ 29 (Hensal J., concurring).

{¶ 58} We reject D.M.'s argument. "[T]he seriousness of the alleged act may speak not only to a child's mental health, but also to [his] threat to the community and to [his] need for rehabilitation beyond [his] twenty-first birthday." *State v. Hopfer*, 112

23.

Ohio App.3d 521, 536, 679 N.E.2d 321 (2d Dist.1996), quoting *Watson,* 47 Ohio St.3d at 96, 547 N.E.2d 1181. Indeed, "any evidence that reasonably supports the juvenile court's decision to relinquish jurisdiction will suffice to sustain that court's judgment." *Id.*

{¶ 59} Fourth, D.M. argues that the juvenile court's "refusal to consider adolescent brain science is legally invalid." D.M. cites comments made by the juvenile court at the September 7, 2016 hearing, at which the court said,

> I understand the science of * * * adolescent brain development - - how it applies to meeting criminogenic needs and addressing risky behaviors. You will have programming at the Ohio Department of Rehabilitation and Correction to address your particular developmental needs as you make changes in your life to ensure that this behavior never happens again, [D.M.]. But I want you to remember that as much as we talk about brain development, that does not give you a pass on culpability in these * * * circumstances, * * * knowing better and what is right and what is wrong.

{¶ 60} Contrary to D.M.'s arguments, the juvenile court did not refuse to consider adolescent brain science. The juvenile court specifically recognized adolescent brain science (i.e., scientific research indicating that an adolescent's brain is not yet fully developed) but found that it did not give D.M. a "pass on culpability in these * * * circumstances" because he should have known "what is right and what is wrong." This finding is supported by the record, including the testimony Dr. Sherman who

24.

distinguished between impulse control and culpability. He stated that while a young person who has not reached neurological maturity might make impulsive decisions, that "[i]t doesn't refer to - - for lack of a better description, formation of a conscience. That should have happened well before this."

{¶ 61} In sum, we find that the juvenile court did not abuse its discretion or violate D.M.'s right to due process when it found that he was not amenable to treatment in the juvenile system and that the safety of the community required that he be subject solely to adult sanctions. The court considered the appropriate statutory factors, and there is a rational basis in the record to support the court's findings. Accordingly, D.M.'s first assignment of error is found not well-taken.

## The Adult Court's Imposition of Consecutive Sentences

{¶ 62} In his second assignment of error, D.M. argues that the trial court erred in imposing consecutive sentences. D.M. claims that, while the trial court recited the proper statutory language to warrant the consecutive sentences, the factors cited by the trial court were not supported by the record. He argues that consecutive sentences are disproportionate to the danger he poses to the public and that his conduct "was not so great or unusual that [one] prison sentence would be inadequate to punish [him] for his actions."

{¶ 63} D.M., however, did not object to the imposition of consecutive sentences at the sentencing hearing. Thus, he has forfeited all but plain error. *State v. Wilson*, 10th Dist. Franklin No. 12AP-551, 2013-Ohio-1520, ¶ 8. Under Crim.R. 52(B), "[p]lain errors

25.

or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

The imposition of consecutive sentences is governed by R.C. 2929.14(C)(4), which provides, in relevant part:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following: * * *

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

{¶ 64} The trial court "is not required to recite any 'magic' or 'talismanic' words when imposing consecutive sentences provided it is 'clear from the record that the trial court engaged in the appropriate analysis.'" *State v. Wright*, 6th Dist. Lucas Nos.

L-13-1056, L-13-1057, L-13-1058, 2013-Ohio-5903, ¶ 33, quoting *State v. Murrin*, 8th Dist. Cuyahoga No. 83714, 2004-Ohio-3962, ¶ 12.

{¶ 65} Here, when imposing consecutive sentences, the trial court characterized this case as "tragic on so many levels that it is hard to * * * comprehend." The court emphasized that the victims were "randomly" chosen by D.M. and "weren't bothering anybody"; that D.M. had "destroyed" their lives because neither victim would ever be able to live "free and apart and separate from the injuries that [D.M.] caused, and all the emotional scars attached to it." The court characterized D.M. as "indifferent" to the serious injuries he caused. The court also made the specific findings required by R.C. 2929.14(C)(4) when it stated:

> This Court finds that consecutive sentences are necessary to protect the public from future crime, and is not disproportionate to the seriousness of the Defendant's conduct or the danger the Defendant poses. The Court further finds that the harm caused was so great and so unusual that no single prison term for any of the offenses committed as any part of any course of conduct adequately reflects the seriousness of the offender's conduct.

{¶ 66} D.M. argues that the record does not support these findings. Specifically, D.M. argues that "[n]othing in the record, except the nature of the offense indicates that D.M. is a threat to society or poses a risk to the public in order to justify consecutive sentences." But, the "nature of the offense" in this case provides more than enough

27.

justification for the court's imposition of consecutive sentences: D.M. shot and seriously injured two complete strangers, in two separate incidents, only 20 minutes apart. One of the injuries was life threatening. When he was apprehended by police a few days later, he was carrying a completely different firearm than the one he had used in the shootings. Given the severity of the injuries he inflicted, the random choice of the victims, the back-to-back nature of the crimes, and the fact that he was apprehended a few days later in the possession of a different gun, there was ample support for the trial court's findings that consecutive sentences are necessary to protect the public from future crimes and adequately reflects the seriousness of D.M.'s conduct.

{¶ 67} In light of the foregoing, we conclude that the trial court did not commit plain error when it imposed consecutive sentences in this case. We find no merit to D.M.'s assertion that the record does not support the trial court's findings under R.C. 2929.14(C)(4). D.M.'s second assignment of error is not well-taken.

## Conclusion

{¶ 68} For all of the reasons expressed above, the September 22, 2016 judgment of the Lucas County Court of Common Pleas, Juvenile Division, and the October 12, 2016 judgment of the General Division, are affirmed. D.M. is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                              _____
                                                                              JUDGE

Thomas J. Osowik, J.

                                         _____
Christine E. Mayle, J.                                                  JUDGE
CONCUR.

                                         _____
                                                                              JUDGE